Gurvan B. BROWN, Appellant

v.

**PENNSYLVANIA RAILROAD COMPANY.**

No. 13164.

United States Court of Appeals Third Circuit.

Argued May 6, 1960.

Decided Sept. 13, 1960.

John M. Feeney, Jr., Pittsburgh, Pa. (McArdle, Harrington & McLaughlin, Pittsburgh, Pa., on the brief), for appellant.

Samuel W. Pringle, Pittsburgh, Pa. (Pringle, Bredin & Martin, Pittsburgh, Pa., on the brief), for appellee.

Before KALODNER, HASTIE and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

This case arises under the Federal Employers' Liability Act, 45 U.S.C.A. §

51 et seq. Following a trial in which he recovered a judgment for $15,000, Gurvan B. Brown, appellant, moved for relief from judgment [1] by way of a new trial limited to the issue of damages pursuant to Rule 60(b), Federal Rules of Civil Procedure, 28 U.S.C.A.[2] The motion was denied, Brown v. Pennsylvania R. Co., D.C.W.D.Pa.1960, 179 F.Supp. 858 and Brown appeals.

Two cases were involved, which were consolidated for purposes of pre-trial and trial. The first case concerned an accident which occurred on December 27, 1953, while Brown was employed as a conductor. Liability was denied by the appellee, Pennsylvania Railroad Company. It also alleged plaintiff was contributorily negligent. The second case concerned an accident which occurred on January 7, 1956. There Brown was employed as a brakeman. Liability was admitted and there was no evidence that Brown was contributorily negligent. As a result of the first accident, Brown lost approximately one week's work but he had no medical expenses and received no medical treatment. As a result.of the second accident, Brown sustained a wage loss of approximately $2100. His actual and prospective medical expenses were less than $1,000. During the period of almost three years intervening between his return to work following his second accident and the trial date, Brown lost no time from work.

At the trial, there was conflicting testimony as to the effects of the accidents suffered by Brown. Brown's principal medical witness contended that his patient had sustained, inter alia, a ruptured disc for which he recommended surgery. Brown, however, refused to follow this recommendation because of the hazards involved. The doctor testified that Brown was unemployable in the labor market. He further stated that the disc condition would become acute and that Brown would eventually submit to surgery, from which a residual disability was probable. The doctor stated that hernias might develop which would be referable to the accident. He testified that Brown was under constant sedation. Brown contended that he had sustained a considerable loss of earning power; that his disability might increase in the future and that he faced the possibility of being laid off; and that although he had been working without interruption up to the trial, he did so on sheer nerve and expected to continue so doing. On the other hand, the Railroad argued that as of the time Brown returned to work following his second accident, he had recovered from his injuries, was able to work and did so as before, and that his earning power had not been diminished as a result of any injury he had suffered in the two accidents.

Brown continued to work at his regular job for several weeks after the case ended. At that time he was called for a conference with the Railroad's doctor, who informed him that he was not medically qualified to continue his duties as a trainman. This opinion was based on the testimony given by Brown's medical witnesses at the trial. Subsequently, Brown received a letter from the Railroad stating that he was being held out of service at the recommendation of its doctor. This action of the Railroad prompted Brown to make a post-trial motion.

In his attempt to gain a new trial, Brown has pursued a somewhat confused course. In his motion to the district

1. Brown's attorney resorted to Rule 60(b) since the ten-day period during which Rule 59 could be invoked had expired.

2. Rule 60(b) in pertinent part is as follows:
"(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: * * * (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) ; (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; * * *."

court for a new trial under Rule 60(b) (3),[3] he asserted:

"* * * that the position taken by the defendant at the time of the trial of this case is in complete contradiction with the position it has taken since the trial of his case and amounts to a fraud and misrepresentation, the purpose of which was to substantially reduce the verdict to which plaintiff was entitled and the action taken by it since the trial caused plaintiff financial harm as a result of his having exercised his rights under the Federal Employer's Liability Acts and as a result, thereof, plaintiff has been deprived of a fair trial on the issue of damages * * *."

The district court noted that in support of that motion Brown in his brief contended that he was entitled to a new trial on the ground of newly-discovered evidence pursuant to Rule 60(b) (2).[4] This newly-discovered evidence apparently was his being held out of service after the trial, of which he had no knowledge before or during the trial. In his brief to this court, Brown repeats the two grounds for a new trial and in addition argues that the district court committed reversible error in withdrawing from the jury the issue of whether he might be held out of service by the Railroad after the trial. We shall discuss these contentions in inverse order.

During the closing argument of Brown's attorney, defendant's counsel objected, and the following exchange took place:

"Mr. Feeney:—Questions have come into this case about whether or not Mr. Brown is able to continue working. He says he is. That is on his present condition. Of course, as Dr. Boone said, if he is not found qualified, he can be taken out of service. Now, will Mr. Brown continue to be qualified? Will he continue to be passed by the railroad doctors after this case is over? You must remember that when he first went back to work—you have to consider something together here. One of the bigger claims by Mr. Pringle in this case which he has harped on repeatedly, is the fact, 'Look at this man, he has worked and worked and worked. He has lost no time, he went back to work in April, 1956 and has worked ever since.'

"Now, does that impress you? Well, sure. Sure, it's difficult to go to work if you have a bad back. Some people can do it. But it's intended to say to you indirectly that this man couldn't have a bad back if he went back to work and has worked.

"Now, in April of 1956, when this man said, 'I want to go back to work,' he had a medical examination by the doctor down at Conway, Dr. Boone, and then Dr. Boone discussed the case with his superior and with the claim department, the same old claim department that runs lawsuits, who knew that someday they would be faced with talking about this case to you twelve jurors, or some twelve people, and after a discussion with the claim department, which was not elaborated upon, Mr. Brown was sent back to work, said he could go back to work.

"Now, can he continue? He has a periodical coming up. Can they pull him out of service if they find or if they say we believe—

"Mr. Pringle:—I am sorry to interrupt. I object to this argument as improper and not warranted by any evidence in this case. The argument started with this question to the jury, 'Will Mr. Brown be passed by the railroad doctors in the future as qualified for employment?' There is nothing in this evidence to indicate that this case will have anything to do with whether he passes or doesn't pass. If his condition continues as it is now, the jury has a right to assume and expect that he will continue to work

3. Ibid.

4. Ibid.

during the period remaining under the union contract, I suggest this argument is unwarranted and prejudicial to the defendant.

"The Court:—There is no evidence in this case that plaintiff is assured of a job or will be dismissed.

"Mr. Feeney:—No sir, neither way.

"The Court:—Is there any evidence he is to be examined?

"Mr. Feeney:—Yes, sir. There is evidence he has a periodic coming up any day.

"Mr. Pringle:—But the trend of this argument and the purpose of it obviously is to create the impression that maybe there will be a change of attitude after this case is over. I resent that. I object to it as not warranted under the evidence or under any of the testimony and as unfair and prejudicial to the defendant, and move for the withdrawal of a juror.

"The Court:—There is certainly no evidence in this case that the railroad will change its attitude toward this plaintiff as a result of your verdict.

"Mr. Feeney:—No, sir.

"The Court:—Any inference to the contrary should be utterly disregarded. No one knows what's going to happen in the future. If you have received any inference from the argument that the plaintiff might be dismissed from the service because of this lawsuit, dismiss it from your minds, it is not warranted by any evidence in this case. In fact, under the Federal Employers Liability Act, the railroad cannot dismiss this plaintiff on account of some lawsuit he brings against it. So you can just disregard any such inference, if you have any such inference. I am not exactly sure that counsel for the plaintiff meant you

to have any such inference. He has a perfect right to argue to you from the evidence what will happen in the future so far as this man's earning power is concerned, so far as his pain and suffering is concerned, as did the defendant's counsel argue to you to the contrary. We all know no one knows the future but God, and we have to do the best we can from evidence, and counsel is at liberty to argue evidence to you from any angle he chooses.

"Now, I think they understand.

"Mr. Feeney:—And I did not intend that inference, your Honor."

■ Plaintiff argues that as a result of this exchange, the jury was precluded from considering the issue of his future disqualification for service. We cannot accept this argument. Rule 51, Federal Rules of Civil Procedure, makes it perfectly clear that:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto * * * stating distinctly the matter to which he objects and the grounds of his objection."

The plaintiff made no objection. Furthermore, the court did not instruct the jury that plaintiff could not be disqualified for service because of anything that happened during the trial, but merely negatived any inference that plaintiff could be disqualified as a reprisal for bringing the suit. In fact, plaintiff's counsel agreed with the court.[5] Moreover, the alleged improper instruction did not lay a ground upon which Rule 60(b) could be invoked, since it is not a substitute for appeal. Title v. United States, 9 Cir., 1959, 263 F.2d 28.

■ The disqualification of plaintiff for service approximately one month after the close of the case does not qualify as "newly discovered evidence" within the purview of Rule 60(b)(2). That phrase refers to evidence of facts in

5. We make no comment on the court's statement that Brown could not be discharged because of bringing an action against the Railroad since it is not in issue and there is no evidence to support a charge that Brown was disqualified for service for such a reason.

existence at the time of trial of which the aggrieved party was excusably ignorant. Campbell v. American Foreign S. S. Corporation, 2 Cir., 1941, 116 F.2d 926; Schuyler v. United Air Lines, D.C. M.D.Pa.1950, 94 F.Supp. 472, affirmed 3 Cir., 1951, 188 F.2d 968. The Railroad had not acted to disqualify Brown for service at the time of the trial.

Finally, Brown urges that the Railroad's conduct during the trial amounted to fraud and misrepresentation in view of his later disqualification for service. The conduct complained of was the assurance given by the Railroad counsel to the jury that Brown was secure in his employment. It should be recalled that at one point Railroad's counsel did make the following statement:

"If his condition continues as it is now, the jury has a right to assume and expect that he will continue to work during the period remaining under the union contract, I suggest this argument is unwarranted and prejudicial to the defendant."

However, it would appear that the court properly instructed the jury that: "There is no evidence in this case that plaintiff is assured of a job or will be dismissed." The court further commented that: "We all know no one knows the future but God" and that "No one knows what's going to happen in the future."

■■ In order to sustain the burden of proving fraud and misrepresentation under Rule 60(b) (3), the evidence must be clear and convincing. Atchison, Topeka & Santa Fe Ry. Co. v. Barrett, 9 Cir., 1957, 246 F.2d 846; Assmann v. Fleming, 8 Cir., 1947, 159 F.2d 332. No evidence was introduced at the hearing on this motion in the district court which would support a conclusion that the Railroad had decided to disqualify Brown for service before or during the trial. In fact, Brown introduced at that hearing the deposition of Dr. William Woodward, the Regional Medical Officer for the Railroad, in which he stated it was only after the trial that he examined the testimony of Brown's medical witnesses and recommended Brown's disqualification for service based on that testimony. And this court has held that it is not fraudulent for an employer to contradict a plaintiff's medical testimony during a trial and then choose to rely on it as a basis for dismissing plaintiff after trial. Bassett v. New York, Chicago & St. Louis R. Co., 3 Cir., 1956, 235 F.2d 900.

 The motion for relief from judgment is addressed to the sound discretion of the trial judge. Delzona Corporation v. Sacks, 3 Cir., 1959, 265 F.2d 157; Atchison, Topeka, & Santa Fe Ry. Co. v. Barrett, supra. Since we find no clear abuse of that discretion, and for the reasons stated herein, the order denying relief from judgment by way of new trial will be affirmed.

**Bruce COOPER, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16525.**

United States Court of Appeals
Ninth Circuit.

Sept. 14, 1960.

529

William Strong, Beverly Hills, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Robert J. Jensen, Wm. Bryan Osborne, Asst U. S. Attys., Los Angeles, Cal., for appellee.

Before HAMLEY and MERRILL, Circuit Judges, and FOLEY, District Judge.

FOLEY, District Judge.

Appellant, hereinafter referred to as defendant, was indicted in the Southern District of California under the false statement statute, 18 U.S.C.A. § 1001.[1]

The indictment charged that:

"On or about the 27th day of March, 1956, defendant Bruce Cooper did wilfully and knowingly make and cause to be made false and fraudulent statements and representations in a matter within the jurisdiction of a department and agency of the United States by stating to Leslie Jacobs and William Flynn, special agents of the Internal Revenue Service, that he had never received any income derived from prostitution, at Los Angeles in the Southern District of California, Central Division, whereas, as he then and there well knew, he had received substantial income during the tax years

---

1. § 1001. Statements or Entries Generally.
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

in question, namely, 1951, 1952, 1953 and 1954, derived from prostitution."

The jury found "the defendant guilty as charged in the indictment." The Court imposed a fine of $5,000 and committed the defendant to the custody of the Attorney General for the period of 18 months.

This Court has jurisdiction on appeal. 28 U.S.C.A. § 1291.

It was stipulated by counsel that if a Mrs. McManus, a reporter, were called to the witness stand and sworn on behalf of the Government she would testify in substance as follows:

"That on or about the 27th day of March, 1956, at the offices of the Internal Revenue Service at 417 South Hill Street, Los Angeles, California, the following persons were present: The defendant Bruce Cooper, his attorney Joseph T. Forno, William Flynn, Internal Revenue agent, and Leslie Jacobs, special agent;

"And that during the period they were present the following questions, among others, were asked of this defendant, to which he gave the following replies (under oath):

"Q. Have you ever been engaged in the following types of business or activities: * * *

"Q. How about prostitution or house of ill repute?

"A. Never.

"Q. $3,000 taken from a Friday to a Monday morning from prostitution. Did you share in that?

"A. No, I never shared in any kind of money that was derived from prostitution."

Exhibit 1–B, containing the above questions and answers, was introduced and admitted in evidence. No contention is made that 1–B is not a correct extract taken from sworn statement of Cooper in the office of the Intelligence Division, Internal Revenue Service, 417 South Hill Street, Los Angeles, California, March 27, 1956.

Witnesses Jacobs and Flynn identified themselves as the Internal Revenue Agents who interviewed defendant Cooper on March 27, 1956. Mr. Jacobs testified that the purpose of the conference was, "It was an inquiry to determine Mr. Cooper's tax liability." And Mr. Flynn stated, "It was in connection with the audit made on Mr. Cooper's income tax." It is apparent from the testimony of Mr. Jacobs and Mr. Flynn that the questions and answers set forth in Exhibit 1–B were propounded to and given by the defendant in a matter within the jurisdiction of a department of the United States, namely, the Treasury Department, Internal Revenue Service, at and during the conference of March 27, 1956. Brandow v. United States, 9 Cir., 268 F.2d 559, 564; Cohen v. United States, 9 Cir., 201 F.2d 386, 392.

That the answers or statements given by the defendant Cooper at the conference of March 27, 1956, were false is supported by the testimony of the five female witnesses. The jury could fairly infer from the evidence that such false statements were fraudulent and were given for the purpose of defrauding the Government of revenue to which it was entitled. It is apparent from the record that the jury's verdict is based upon substantial evidence.

Defendant complains of the denial by the District Court of his motions for dismissal of the indictment, for discovery and inspection of certain affidavits, and for a bill of particulars.

Defendant contends that the indictment is defective, and that the Court erred in denying his motion to dismiss the indictment. In United States v. Silver, 2 Cir., 235 F.2d 375, the indictment, under 18 U.S.C.A. § 1001, like that under consideration here, followed the language of the statute and was held to be fully adequate to inform the defendant of the essential facts constituting the offense.

■ Considering indictments in the language of the statute, the Supreme Court in United States v. Debrow, 346 U.S. 374, 377, 74 S.Ct. 113, 115, 98 L.Ed. 92, held:

"The charges of the indictments followed substantially the wording of the statute, which embodies all the elements of the crime, and such charges clearly informed the defendants of that with which they were accused, so as to enable them to prepare their defense and to plead the judgment in bar of any further prosecutions for the same offense. It is inconceivable to us how the defendants could possibly be misled as to the offense with which they stood charged. The sufficiency of the indictment is not a question of whether it could have been more definite and certain. * * * "

The motion to dismiss the indictment was properly denied.

The motion for discovery and inspection and the motion for a bill of particulars each seek access to and have photostats made of three affidavits taken March 27, 1956, by an agent of the Internal Revenue.

Paragraph I of the motion for discovery and inspection is as follows:

"Your petitioner, Bruce Cooper, hereby asks this Court to require the Attorney for the United States of America for the Southern District of California, Laughlin E. Waters, to allow your petitioner, Bruce Cooper, to have photostats made of the three affidavits in the United States Attorney's possession. These affidavits were taken March 27, 1956 by one Harry Lockman of the Internal Revenue Department of the United States Government; said affidavits purportedly stating that money was given to your petitioner for purposes of prostitution during the period, 1951 through 1954."

Paragraph III of said motion for discovery and inspection reads:

"Your petitioner respectfully moves under Rule 16 of the Federal Code of Criminal Procedure that this Honorable Court compel the United States Attorney to allow these affidavits to be photostated at a time and place set out by this Court:

"Rule 16 Discovery and Inspection

" 'Under Motion of a defendant any time after the filing of the indictment or information, the court may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documentary or tangible objects—upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable.' "

In the motion for a bill of particulars, Paragraph III is as follows:

"Your petitioner, Bruce Cooper, hereby asks this Court to require the Attorney for the United States of America for the Southern District of California, Laughlin E. Waters, to allow your petitioner, Bruce Cooper, to have photostats made of the three affidavits in the United States Attorney's possession. These affidavits were taken March 27, 1956 by one Harry Lockman of the Internal Revenue Department of the United States Government; said affidavits purportedly stating that money was given to your petitioner for purposes of prostitution during the period 1951 through 1954."

The motion for discovery and inspection was heard and denied by Judge Tolin and Judge Harrison heard and denied the motion for a bill of particulars. Subsequently, and just prior to the beginning of the trial, Judge Hall, the trial Judge, informed counsel for the defendant that if any of the persons who made the three affidavits were called as witnesses, he would require counsel for the Government to deliver the affidavit or affidavits to defendant's counsel. No contention seems

to have been made that 18 U.S.C.A. § 3500(b) was not complied with by the Court.

■ The motion for discovery and inspection on its face shows that counsel for the defendant invoked Rule 16 of the Federal Rules of Criminal Procedure. It will be noted that Rule 16 was not correctly quoted in Paragraph III of the motion. Rule 16 is as follows:

"Upon motion of a defendant at any time after the filing of the indictment or information, the court· may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, *obtained from or belonging to the defendant or obtained from others by seizure or by process,* upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. \* \* \*" [Emphasis added.]

Obviously, Rule 16 has no application here as no contention seems to have been made that the affidavits were obtained from or belonged to the defendant, or obtained from others by seizure or by process.

The motion for discovery and inspection was correctly denied.

■ The motion for a bill of particulars is apparently an attempt to circumvent the ruling of Judge Tolin in his denial of a motion for discovery and inspection. As above noted, each of these motions sought the same result.

Rule 7(f), Federal Rules of Criminal Procedure, 18 U.S.C.A., should not be invoked to bring about a result prohibited in effect by Rule 16, Federal Rules of Criminal Procedure, 18 U.S.C.A.

"A bill of particulars should be granted where it is thought necessary (1) to protect the defendant against a second prosecution for the same offense, or (2) to enable the defendant to adequately prepare his defense and avoid surprise at the trial. \* \* \* It is apparent that the offense charged is sufficiently defined to protect appellant from double jeopardy." Remmer v. United States, 9 Cir., 205 F.2d 277, 281.

The bill of particulars here does not ask that the charge be particularized. All that is asked here is disclosure of evidence. Defendant requests that three affidavits taken March 27, 1956, by one Harry Lockman of the Internal Revenue, be made available to defendant for purposes of having photostats made. As there is no request for the names of those who made the affidavits, it is fair to imply that the defendant knew who made them and if he did not know the names of the witnesses, the Government would not be required to provide them. In United States v. Bryson, 16 F.R.D. 431, 436, District Judge Murphy, in the Northern District of California, considering an indictment under 18 U.S. C.A. § 1001, held that it is not the function of bill of particulars to force Government to spread its entire case before accused and order requiring Government to state in bill of particulars overt acts upon which indictment is based would be vacated.

■ The motion for a bill of particulars is addressed to the sound discretion of the trial court and the trial court's ruling thereon should not be disturbed in the absence of an abuse of that discretion. Nye & Nissen v. United States, 9 Cir., 168 F.2d 846, 851; Schino v. United States, 9 Cir., 209 F.2d 67, 69; Kobey v. United States, 9 Cir., 208 F.2d 583, 592.

The defendant was not prejudiced and Judge Harrison rightly denied his motion for a bill of particulars.

Defendant claims error by the Court in permitting defendant's former wife, Patricia Bulayunjan, to testify against him. Outside of the presence of the jury, counsel objected as follows:

"Mr. Strong: This woman was married to Mr. Cooper from 1946 to 1958 and cannot testify against him."

In the course of the colloquy which followed between Court and Counsel, Exhibit 6, a certified copy of a judgment of annulment entered in the Superior Court of the State of California, in and for the County of Los Angeles, on the 18th day of January, 1957, was marked for identification and shown to the Court. Following that counsel for the defendant urged that the witness could not testify as to what happened in 1951, 1952, and 1953. After admitting Exhibit 6 in evidence, the trial Judge advised the witness as follows:

"This is a certified copy of a judgment of annulment, which is dated the 18th of January, 1957, in the Superior Court of the State of California in and for the County of Los Angeles and which was filed on January 18, 1957, and entered January 22, 1957. * * *, I will state to the witness, the question has been raised by counsel for Mr. Cooper as to whether or not you can testify concerning any act or conduct between both of you during the period from the date of the marriage ceremony on December 1st, 1945, until the annulment. The effective date of the annulment was January 22, 1957. * * *—that you may testify concerning any conduct of Mr. Cooper's during the period that you were married to him; you may testify concerning any statement he made to you while other people were present; but you may not testify concerning any statements or concerning matters told you when the two of you were alone. Do you understand?"

There was no contention made at the trial by the defendant that the marriage relation, if it ever existed, existed after January 22, 1957. The language of counsel in urging his objections to the calling of the witness, Patricia Bulayunjan, recognized that the marriage had terminated and no objection was made to the introduction of Exhibit 6 in evidence.

From an examination of the record, it is apparent that the witness, Patricia Bulayunjan, did not testify as to any confidential marital communications. She disclosed no part of any conversation or communication occurring between her and defendant while alone.

Regardless of whether the marriage was by the decree of annulment rendered void from its inception or whether the decree operated only from the date of entry, we have a state of facts similar to those dealt with by Chief Justice Warren in Pereira v. United States, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435:

"The petitioners challenge the admissibility of Mrs. Joyce's testimony as being based on confidential communications between Mrs. Joyce and Pereira during the marriage. Petitioners do not now contend that Mrs. Joyce was not a competent witness against her ex-husband. They concede that the divorce removed any bar of incompetency. That is the generally accepted rule. Wigmore, Evidence, § 2237; 58 Am. Jur., Witnesses, § 204. Petitioners rely on the proposition that while divorce removes the bar of incompetency, it does not terminate the privilege for confidential marital communications. Wigmore, Evidence, § 2341(2); 58 Am.Jur., Witnesses, § 379. This is a correct statement of the rule, but it is inapplicable to bar the communications involved in this case, since under the facts of the case, it cannot be said that these communications were confidential. Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private. Blau v. United States, 340 U.S. 332 [71 S.Ct. 301, 95 L.Ed. 306]; Wolfle v. United States, 291 U.S. 7 [54 S.Ct. 279, 78 L.Ed. 617].

The presence of a third party negatives the presumption of privacy. Wigmore, Evidence, § 2336. So too, the intention that the information conveyed be transmitted to a third person. Id., § 2336. The privilege, generally, extends only to utterances, and not to acts. * * * "

The testimony of Patricia Bulayunjan was properly admitted.

In the process of the selection of the jury, the Judge informed the venire, among other matters, that:

"As noted in the indictment, the charge is that the defendant made a false statement, in that he had never received any money from prostitution, * * * ."

And the jurors were instructed that:

"The gist of the offense is that the statements to the effect that he never received or shared in money derived from prostitution were false as to his source of income. You cannot convict the defendant merely because he engaged in the business of, or activities connected with, prostitution.

"There thus remains for your determination two elements: Was the statement false, that is, did the defendant beyond a reasonable doubt receive substantial income during the tax years 1951, 1952, 1953, and 1954 which was derived from prostitution. * * * "

■■ The jury was not misled and the instruction was an accurate and correct statement. Furthermore, defendant is in no position to assign error as to any portion of the charge as failed to avail himself of the privilege given by Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A., of objecting to the instructions given as a whole or to any individual instruction.

Defendant claims error " * * * in admitting evidence of ownership of houses of prostitution (Rep.Tr. 258–262) on the theory of 'prior similar acts' (Rep.Tr. 260)."

■ The indictment charged and Exhibit 1–B tended to show that the defendant stated that he had never shared in any kind of money that was derived from prostitution. It was brought out on cross-examination by defendant's counsel that the witness, Patricia Bulayunjan, first met the defendant in February of 1945 (Rep.Tr. 211); that she had engaged in prostitution prior to meeting the defendant and that she worked in Delano, California, as a prostitute after meeting him. (Rep.Tr. 212) Then followed cross-examination showing that after meeting defendant she had worked, obviously, as a prostitute, at various other locations. (Rep.Tr. 212, 213) She testified she first went to work in San Francisco, California, in 1945. Counsel for the Government, in opening his re-direct examination (Rep.Tr. 258), propounded the question: "You mentioned on cross-examination a number of addresses." Then followed a mention of a number of addresses given by the witness on her cross-examination (Rep.Tr. 213); then the question:

"Q. Will you go into more detail about those places—what were they?

"A. Well, they were all existing as houses of prostitution.

"Q. Do you know who owned those?

"A. Bruce Cooper.

"The Court: Do you mean he owned the real estate?

"The Witness: He owned the place, the house.

"Q. By Mr. Osborne: What was his position in the house?

"Mr. Forno: Objected to, irrelevant and immaterial.

"The Court: Objection overruled." (Rep.Tr. 259)

It will be noted that the witness' testimony as to Cooper's ownership was received without objection. The above noted objection came after the testimony as to ownership was given. The first mention of "other offenses" appears in

the statement by the Court (Rep.Tr. 260) after the testimony of ownership of houses of prostitution had been received without objection upon the ground that such testimony constituted evidence of other and prior offenses, or without objection on any other ground. Defendant complains that such testimony was highly prejudicial. While this testimony of ownership of houses of prostitution was not complimentary, it tended to refute defendant's statement that he had never shared in any kind of money that was derived from prostitution.

Defendant also complains that the Court erred in denying motions for continuance before the trial and after the Government rested. He argues that:

"Manifestly, in view of the insufficiency of the indictment, appellant could not prepare to defend against undisclosed accusations of prostitutes until he learned who, when, where, it was claimed he was paid, and in what amount. This information did not come up until the trial was under way."

Defendant was not hurried into trial. The indictment was returned November 19, 1958, and the trial began March 3, 1959. The indictment clearly informed the defendant of that with which he was charged and the Court did not abuse its discretion in refusing continuances. Elkins v. United States, 9 Cir., 266 F.2d 588, 595.

There is no merit to the contention that the prosecutor engaged in prejudicial misconduct. Nor is there merit to the contention that the answer in Exhibit 1–B, "No, I never shared in any kind of money that was derived from prostitution," is limited or restricted by the question, namely, "$3,000 taken in from Friday to a Monday morning from prostitution. Did you share in that?"

The evidence being sufficient to sustain the verdict of the jury and finding no error, the judgment is affirmed.

**UNITED STATES of America,**
Appellant,

v.

**Thomas R. BRUNNER, Trustee in Bankruptcy, Appellee.**

**In the matter of Eugene L. BROWN and Maxine E. Brown, husband and wife, doing business as Lockjoint Wood Products, Bankrupt.**

**No. 6282.**

United States Court of Appeals
Tenth Circuit.

Sept. 3, 1960.

Kathryn H. Baldwin, Attorney, Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Wilbur G. Leonard, U. S. Atty., Topeka, Kan., and Morton Hollander, Attorney, Dept. of Justice, Washington, D. C., on the brief), for appellant.

Fred Hinkle, Wichita, Kan., for appellee.

Before BRATTON, PICKETT and LEWIS, Circuit Judges.

PICKETT, Circuit Judge.

This appeal raises the question of whether the United States is entitled to set off in a bankruptcy proceeding an amount it owes the bankrupts on an executory contract against its claim for damages arising out of the bankrupts' failure to complete that contract.

The bankrupts' claim arose from their partial performance of a written contract with the Army Engineer Corps, and the claim of the United States is based on a breach of that same contract, occasioned by the filing of a voluntary bankruptcy petition. The contract in question required the bankrupts, Eugene L. Brown and his wife, to manufacture 128,200 small wooden boxes and deliver them to the United States Army Chemical Arsenal in Arkansas at a price of 42¢ each. The contract provided that not less than 10% of the total number of boxes was to be delivered on or before June 2, 1958, with additional 10% shipments to follow at 15-day intervals, and complete delivery was to be made not later than October 15, 1958. Under a default clause the United States could terminate the contract if the Browns failed to make delivery of the boxes within the specified times. Upon termination, it could purchase the boxes elsewhere and the contractors would be liable to the United States for the excess cost of repurchase.[1] On June 25, 1958, the Browns filed a voluntary petition in bankruptcy and were duly adjudicated

1. The default provision of the contract reads, in part:

"Default: (a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances: * * *

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or * * *

(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor

bankrupts on June 30, 1958. On the date of the filing of the petition in bankruptcy, there was due to the Browns the sum of $3,966.60. By letter dated June 27, 1958, the bankrupts were notified that "In view of the bankruptcy proceedings, you are hereby given Notice of Default in accordance with * * * your contract and your right to proceed with performance * * * is hereby terminated * * *." Thereafter the United States filed a preliminary proof of claim in an amount representing the cost in excess of the contract price of purchasing the undelivered boxes from another source, less the $3,966.60 due the bankrupts. Twenty days later the referee, on petition of the trustee, ordered the United States to show cause why the $3,966.60 should not be paid. The answer to this petition admitted that the sum was due the bankrupts and asserted the right to set it off against its larger claim for breach of contract and to recover the balance as a claim having priority by reason of 11 U.S.C. A. § 104, sub. a and 31 U.S.C.A. § 191. The referee held that on the date of the filing of the petition in bankruptcy, the United States had no provable claim against which there could be a set-off and the trustee was entitled to the payment of the sum due. The claim without the set-off was allowed in full as a common claim against the bankruptcy estate. Upon petition for review, the District Court adopted the findings and conclusions of law of the referee and affirmed his action.

■ Provision for set-off of mutual debts of a bankrupt and his creditors is found in 11 U.S.C.A. § 108, which reads:

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of Section 93 of this title; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy * *."

The purpose of this section is to make it unnecessary for a creditor to pay the bankruptcy estate the full value of a claim he owes the bankrupt, while at the same time being allowed only partial satisfaction of a claim due him from the estate.[2]

shall be liable to the Government for any excess costs for such similar supplies or services, provided, that the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause."