**Michael L. KETTENBACH and Leland Properties, Inc., Plaintiffs,**

v.

**Arthur S. DEMOULAS, Defendant.**

**Civ. A. No. 92–10482–PBS.**

United States District Court,
D. Massachusetts.

Oct. 6, 1995.

Jeffrey Denner, Cuddy Bixby, Boston, MA, for James Sullivan.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

The plaintiffs Michael L. Kettenbach ("Kettenbach") and Leland Properties, Inc., ("Leland")[1] move for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(2) (Docket No. 208), or to supplement their pending motion for a new trial pursuant to Fed. R.Civ.P. 59 (Docket No. 170), based on "newly discovered evidence."[2]

Specifically, this evidence is a recorded audiotape of a conversation between Christine Primo ("Primo") and Edmund J. Browne, Jr., ("Browne"). Kettenbach argues that this tape contains incriminating statements by Browne admitting that he participated in a conspiracy with defendant Arthur S. Demoulas ("Arthur S." or "Demoulas") and certain of his agents and associates to intercept oral communications at Demoulas Super Markets, Inc. ("DSM") and conceal their activities. Plaintiffs also submitted an affidavit of Primo in which she states that Browne had admitted wiretapping the DSM offices prior to the taped conversation.

Defendant parries that the taped conversation contains a statement by Browne denying involvement in the wiretap scheme and that his remaining statements to Primo are mere braggadocio. The transcript can fairly be read either way.

The Court holds that this evidence would have been admissible at trial, as a statement by a co-conspirator, Fed.R.Evid. 801(d)(2)(E), and would have been "of such a material and controlling nature as [would] probably [have] chang[ed] the outcome," only if read (and heard) in conjunction with the sworn statements of Primo. *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir.1995) (alterations in original).

David J. Burgess, Gary C. Crossen, Anthony Mirenda, Audrey C. Mark, Foley, Hoag & Eliot, Boston, MA, for Michael L. Kettenbach, Leland Properties, Inc.

Carol R. Cohen, Robert C. Gerrard, Thomas S. Fitzpatrick, James G. Cockfield, Davis, Malm & D'Agostine, P.C., Boston, MA, George A. McLaughlin, III, McLaughlin Brothers, Boston, MA, Anthony R. Pelusi, Jr., Cambridge, MA, for Arthur S. Demoulas.

Gregory I. Massing, Attorney General's Office, Boston, MA, for Thomas F. Reilly.

Jonathan Chiel, United States Attorney's Office, Boston, MA, for U.S.A.

---

**1.** For ease of reference, the plaintiffs shall be collectively called "Kettenbach."

**2.** In light of this ruling, the Court need not address the other grounds asserted for the motion for relief from judgment and motion for a new trial.

Because the testimony of Primo is key to both the issues of materiality and admissibility, the Court is unwilling to determine the plaintiffs' motion without a more ample record. Therefore, the Court orders the parties to take the deposition of Primo, Browne and one Stephen Harvey in order to develop a record upon which a Fed.R.Evid. 104(b) preliminary determination may be based.

## FACTUAL BACKGROUND

### A. The Trial

On February 27, 1992, Plaintiffs filed a complaint[3] alleging that Arthur S. trespassed on their property and invaded their privacy by installing electronic listening devices in violation of federal and state wiretap laws. The case eventually proceeded to trial, which commenced on July 25, 1994 and ended on August 12, 1994. Contemporaneous with the present action were a series of high profile, high stake actions brought in Massachusetts state court by and between various members of the Demoulas family.[4]

At trial, Kettenbach attempted to prove that an agent of Demoulas placed electronic listening devices at DSM and other places as a method of gathering confidential information for use in the state litigation. Specifically, Kettenbach's primary theory was Arthur S. hired someone named Kevin Kattar with gifts and money worth upwards of $200,000 in return for installing one of these devices within Kettenbach's offices. In addition, Kettenbach endeavored to prove that Demoulas illegally entered his office and proceeded to copy private documents. Plaintiffs relied in large part on circumstantial evidence of transactions which they claimed Arthur S. could have known about only if he had access to wiretapped conversations.

Categorically denying his involvement in any wiretap scheme, Arthur S. argued to the jury that Kettenbach and his inlaws planted the devices themselves as a set up. According to him, Plaintiffs planned to utilize a favorable verdict from this Court to support a defense of "unclean hands" in the state litigation. Demoulas also put forth evidence that focused on both the quality and the location of the eavesdropping devices. The devices were described as unsophisticated, and they were placed at locations so that eventual discovery was inevitable. Significantly, there were no bugs in the offices of Telemachus Demoulas, the chief protagonist in the state litigation, who declined to testify at the federal trial ostensibly due to heart problems. Furthermore, defendant offered testimony that his knowledge of the impending transactions, particularly one between DSM and Walgreens, resulted from a company rumor.

At the end of trial, on August 12, 1994, the jury returned a verdict in favor of defendant on Counts I, III and VI. (Docket No. 162). On August 15, 1994, the Court directed a verdict for Demoulas on Counts II, IV and V. (Docket No. 163). The judgments were entered on August 22, 1994.

### B. The Browne–Primo Tape

■■■ On January 26, 1995, a little more than six months after the entry of judgment, Primo travelled to Kittery, Maine, with Browne, during which Primo recorded a conversation with Browne discussing certain aspects of the "Demoulas case." Browne was not aware that he was being recorded.[5] As

---

3. The Complaint contained the following counts: Violation of Federal Wire Tapping Statute 18 U.S.C. § 2511(1) (Count I); Violation of State Wire Tapping Statute M.G.L. c. 272 § 99 (Count II); Common Law Trespass to Real Property (Count III); Common Law Trespass to Personal Property (Count IV); Common Law Conversion (Count V); and Violation of State Invasion of Privacy Statute M.G.L. c. 214 § 1B (Count VI).

4. *See Rafaele Lorain Demoulas et al. v. Telemachus Demoulas et al.,* C.A. No. 90–2344 (Middlesex Super.Ct.) (stock transfer action); *Arthur S. Demoulas v. Demoulas Super Markets, Inc. et al.,*

C.A. No. 90–2927 (Middlesex Super.Ct.) (shareholder derivative action).

5. Maine law regarding the interception of oral and wire communications "govern[s] only conversations that were recorded by someone not a party to the communication." *State v. Cyran,* 586 A.2d 1238, 1240 (Me.1991); *see also* Me.Rev. Stat.Ann. tit. 15, § 709(4) (West 1980 and 1994 Supp.). The same result is reached under federal law. *See* 18 U.S.C. § 2511(2)(c)–(d). If the concealed recording had occurred in Massachusetts, where both Primo and Browne reside, it would have violated Massachusetts law. *See* M.G.L. c. 272, § 99(b)(4).

is evident from a transcript of the recording, Primo and Browne were engaged in a romantic dalliance, which lulled Browne into confiding in Primo, and discussing his involvement in electronic operations conducted in and around DSM headquarters on June 27, 1990. Browne is a private investigator at times employed by M. Alexander Investigations, Inc., an investigative agency owned and operated by Michael J. Szpuk ("Szpuk"). Demoulas Aff. ¶ 2–4; Szpuk Aff. ¶ 1–2 (dated July 10, 1995).

The transcript of the recording reveals several cryptic and ambiguous comments by Browne upon which the parties wish to put very different interpretations. Primo begins the allegedly "incriminating" portion of the conversation by requesting "professional electronic help" from Browne regarding a fictitious scheme to install listening devices at Primo's husband's former place of employment. Tape Tr. at 47–48. Browne asked whether she had "told him about the Demoulas case." *Id.* at 48. The following colloquy ensued with relevant parts excerpted:

Primo: I told him, I didn't tell him about the Demoulas case itself. I told him that I knew that you . . . I told him I knew of a job that I knew that you did. . . . I didn't tell him about the Demoulas case 'cuz that is none of his business but I told him that I knew of a case that you did with somebody you used to work with,

. . . .

Browne: Did you tell him I was also in federal court testifying, we won the case, but—

Primo: No, I didn't have to get into that. *Id.* at 48. Primo then asked whether Browne had been compensated for his work, and Browne replied, "It's still . . . No, 'cuz it's not totally over with yet. The federal, they appealed it to the state, to the state level. It's in state court now. I was served a subpoena for a, for a deposition for state court now." *Id.* at 49.[6]

Later in the conversation, Browne alluded to "Michael," presumably his employer, Szpuk, and a Connecticut state trooper with whom he did some electronic surveillance work. *See id.* at 49 (Browne: "I'm just saying that he's the one (the Connecticut state trooper) that we, that did the job for us."). The latter figure apparently is William Hawks ("Hawks"), a retired Connecticut state trooper with expertise in electronic surveillance. *Id.* Exactly what was the nature of the "job" is not discussed explicitly in the recording.

At one point, Primo asks whether Browne was "bagged" for failing to "change[ ] the batteries[.]" *Id.* at 50. Again, there is no description of the device or its location. The reference to batteries, however, was linked to the "Demoulas case" by the following exchange:

Primo: Didn't you get bagged? You never changed the batteries or something?

Browne: Well we changed but I never got arrested, no. He never got arrested.

Primo: Thought you changed the batteries or something.

Browne: They tried. That was in the Demoulas case, they tried to say that we . . . hardwired the corporate offices.

Primo: But ya did.

Browne: But, Chris, that's what they say. I never did that.

Primo: They say . . . aw right.

Browne: They said a lot of things, Chris. Did they tell you that I did those nasty things?

*Id.*

Browne then asked Primo whether Joseph E. McCain, an investigator retained by Kettenbach, McCain Aff. ¶ 2, had contacted her. Browne indicated that he believed McCain was trying to put him in the "can." Tape Tr. at 50–51. On the tape, Primo denied having ever spoken to McCain, although it is clear from affidavits submitted by Kettenbach that she cooperated extensively with McCain in setting up the rendez-vous and recorded conversation. McCain Aff. ¶ 3; Primo Aff. ¶ 4. Browne then recounted his exploits in avoiding Kettenbach's efforts to speak with him, tape tr. at 51–52, and told Primo that he

---

**6.** Browne apparently confused the present litigation with the state litigation.

believed that McCain was trying to get her to lie about his involvement. *Id.* at 53.

When pressed by Primo again as to why he had not been paid for the "job" he had performed, Browne told her that Demoulas was not in a position to pay during the pendency of the state litigation:

> Browne: He can't [pay]. You gotta understand something ... when it's under appeal, we put a bill in smaller than $4800 just for routine expenses. They ... said they couldn't pay us until the appeals was [sic] over. Because look—if any monies come to me, or Mike or through the agency, or us individually ...
>
> Primo: They're going to say it's a payoff.
>
> Browne: That's right. You can't do anything. It could take another year until this is over and done.

*Id.* at 54–55. A moment later, Browne exclaimed, "you don't ring the register in until the sale's complete. The sale's not complete. Do you understand what I'm sayin'?" *Id.* at 56. Besides a brief reference to his apparent willingness to "take the heat" if questioned by a grand jury or called as a witness, *id.* at 59, Browne made no further statements relevant to this litigation.

Some months later, McCain went to Browne's home to confront him with the fruits of his and Primo's efforts. At 6:55 A.M. on June 21, 1995, Browne, McCain, and one of Kettenbach's attorneys had a brief, but heated exchange, at which McCain played portions of the tape back to Browne. According to McCain, Browne then became agitated, asked his visitors to leave, and drove off in a hurry. McCain Aff. ¶ 4–11.

An employee of McCain who was positioned outside Szpuk's residence then saw Browne's car approach at high speed.[7] Browne entered the house and emerged with a younger man, probably Szpuk's son; they then both drove off again at high speed. Fiddler Aff. ¶ 6–11; Szpuk Aff. ¶ 3 (dated Sept. 27, 1995).

## DISCUSSION

■■ "Rule 60(b) invested the federal courts, in certain carefully delimited situations, 'with the power to vacate judgments whenever such action is appropriate to accomplish justice.'" *Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59,* 953 F.2d 17, 19 (1st Cir.1992) (quoting *Klapprott v. United States,* 335 U.S. 601, 614–15, 69 S.Ct. 384, 390, 93 L.Ed. 266 (1949)).[8] "[D]istrict courts enjoy broad discretion in deciding motions brought under Rule 60(b)...." *Hoult,* 57 F.3d at 3. Because of the policy favoring the finality of judgments, however, courts are "disinclined to disturb judgments under Rule 60(b) unless the movant can demonstrate that certain criteria have been achieved." *Teamsters,* 953 F.2d at 19–20; *see also Parrilla–Lopez v. United States,* 841 F.2d 16, 19 (1st Cir.1988) ("[A] new trial is extraordinary relief, and as such should only be granted under extraordinary circumstances.").

### A. *Rule 60(b)(2)*

■■ The centerpiece of Kettenbach's Rule 60(b) motion is the claim that the recorded conversation between Browne and Primo constitutes "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial

---

**7.** Evidently, two investigators from McCain's agency and another attorney were poised to confront Szpuk once they heard from their associates that Browne had been approached. McLaughlin Aff.; Fiddler Aff.

**8.** The rule provides in pertinent part:
On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud

(whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), (3) not more than one year after the judgment, order, or proceeding was entered or taken.
Fed.R.Civ.P. 60(b).

under Rule 59(b)." Fed.R.Civ.P. 60(b)(2). "An order for a new trial on the ground of newly discovered evidence requires proof of the following elements: (1) The evidence has been discovered since the trial; (2) The evidence could not by due diligence have been discovered earlier by the movant; (3) The evidence is not merely cumulative or impeaching; and (4) The evidence is of such nature that it would probably change the result if a new trial is granted." *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1527 (1st Cir.1991); *see also Duffy v. Clippinger*, 857 F.2d 877, 879 (1st Cir.1988) (stating same elements).[9]

### 1. *The Evidence Must Be Newly Discovered.*

■ A contested threshold question in this case is whether the recorded conversation was "newly discovered" within the meaning of Fed.R.Civ.P. 60(b)(2). Demoulas argues that the evidence must be in existence at the time of the trial to qualify for Rule 60(b)(2) relief. Under this interpretation, the tape recording is barred because the Browne–Primo conversation took place several months after trial. Kettenbach urges a contrary interpretation that would find evidence to be "newly discovered" so long as the facts which make the evidence relevant occurred before the judgment. Consistent with this view, the newly discovered evidence is not merely the recording but includes the facts which Browne describes on the tape—the alleged "wiring" of DSM in June 1990.

The First Circuit has held that " 'newly discovered evidence' normally refers to 'evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant.' " *Rivera v. M/T Fossarina*, 840 F.2d 152, 156 (1st Cir.1988) (quoting *Brown v. Pennsylvania R.R. Co.*, 282 F.2d 522, 526–27 (3d Cir.1960), *cert. denied*, 365 U.S. 818, 81 S.Ct. 690, 5 L.Ed.2d 696 (1961)). There is some ambiguity in this statement, however, as to whether it is the evidence or the facts that must exist at trial.

In *Rivera*, a maritime pilot sued in admiralty for pilotage fees and summary judgment was granted for the defendants. After the judgment, the plaintiff obtained an opinion from the Coast Guard that the district court's order in the case created a "potentially dangerous situation." 840 F.2d at 155–56. The Court of Appeals affirmed the trial court's denial of relief because the Coast Guard interpretation, which was premised on the district court's ruling, occurred after the judgment and thus was not newly discovered evidence. *Id.* at 156.

Defendant cites several cases for this general proposition, but in each of these cases as well as others not cited by the parties, courts have found evidence not to be newly discovered if based on *facts* not extant at trial. *See, e.g., In re Abijoe Realty Corp.*, 943 F.2d 121, 124 n. 3 (1st Cir.1991) (in Chapter 11 bankruptcy, debtor denied relief from judgment based on newly discovered evidence of events that occurred two years after period relevant to proceeding); *Davis v. Jellico Community Hosp.*, 912 F.2d 129, 135 (6th Cir.1990) (plaintiff's premature death is not newly discovered evidence warranting relief from judgment, which had granted damages based on calculation of life expectancy); *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1352 (5th Cir.) (Jones Act case based on seaman's injuries, witnesses who observed plaintiff after trial and determined that her injuries were not as severe as she had maintained at trial were not newly discovered evidence), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988); *Brown*, 282 F.2d at 526–27 (event occurring one month after close of case not newly discovered evidence); *Campbell v. American Foreign S.S. Corp.*, 116 F.2d 926, 927–28 (2d Cir.)

---

**9.** *Raymond* and *Duffy* do not specify whether the underlying motions for new trials were brought under Rule 59 or Rule 60(b)(2). The four-factor test, however, applies in either instance. *See* 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2859, at 302 (2d ed. 1995) ("The same standard applies to motions on the ground of newly discovered evidence whether they are made under Rule 59 or Rule 60(b)(2), and decisions construing Rule 59 in this context are authoritative in construing Rule 60(b)(2)."); 7 James Wm. Moore, *Moore's Federal Practice* ¶ 60.23[4] (2d ed. 1995) (principles for construing Rule 59 generally applicable to Rule 60(b)(2)); *see also Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990) (borrowing test from Rule 59 cases in deciding Rule 60(b)(2) motion).

(Jones Act case in which seaman granted maintenance damages, post-judgment fact of seaman's election to union office and consequent economic self-sufficiency was not "newly discovered" evidence), *cert. denied,* 313 U.S. 573, 61 S.Ct. 959, 85 L.Ed. 1530 (1941).

Other courts of appeals faced squarely with this issue have held that so long as the "evidence pertain[s] to facts in existence at the time of trial, and not to facts that have occurred subsequently," 6A Moore, *supra,* ¶ 59.08[30] at 59–101, whether the evidence itself came into existence after trial is immaterial. In *Chilson v. Metropolitan Transit Auth.,* 796 F.2d 69 (5th Cir.1986), Chilson, a former transit authority employee, brought a retaliatory discharge claim against his employer. He alleged that he had been fired in violation of his free speech rights due to his criticism of the agency's administration of certain contracts. Following a jury verdict for the defendant, the agency undertook an internal audit which demonstrated that the plaintiff's criticisms were valid. Chilson moved for a new trial on the grounds that this audit was "newly discovered evidence" under Rule 60(b)(2). *Id.* at 69–70.

The court held that the actual evidence (i.e., that which made the audit material and relevant) was the contract overpayment revealed by the audit rather than the audit itself. "When the concern is materiality and relevance, what is critical is the content of the evidence, not the form in which it comes." *Id.* at 72. Because the misconduct documented by the audit predated the judgment, the audit was considered newly discovered evidence under Rule 60(b)(2).

Similarly, in *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509 (8th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), plaintiff sued for fraud, conspiracy, and breach of contract arising out of an irrigation contract with the defendant. At trial a deposition of a tribal member was read into the record and, after a judgment for the defendant, the plaintiff discovered grand jury testimony by the deponent in which he admitted that he had perjured himself. *Id.* at 515–16. Despite the fact that the grand jury testimony was not taken until

after the trial, "the perjury existed at the time of the trial" and thus could be the basis of a Rule 60(b)(2) motion. *Id.* at 516.

The Court finds these cases persuasive and entirely consistent with First Circuit case law. *See Rivera,* 840 F.2d at 156 ("newly discovered evidence normally refers to evidence of *facts* in existence at the time of trial of which the aggrieved party was excusably ignorant.") (emphasis added) (internal quotations and citation omitted). In this case, the recorded conversation between Browne and Primo occurred after the trial, but the events that it purports to describe (i.e., Browne's alleged wiretap of DSM) took place long before judgment. Indeed, the alleged "wiring" of DSM by Demoulas is the basis for the present action. Thus the tape is "newly discovered evidence" within the meaning of Rule 60(b)(2).

### 2. The Evidence Could Not By Due Diligence Have Been Discovered Before Trial

"In order for evidence to be newly discovered, the party seeking a new trial must be unaware of the existence of the evidence before or during the trial." *Parrilla–Lopez,* 841 F.2d at 19. Although the tape clearly did not exist until after the trial, the facts to which the tape pertain may have been discoverable in time for use at trial. If Kettenbach could have learned of Browne's involvement in the case before or during the trial through the exercise of due diligence, relief from judgment is unwarranted. *See id.* at 19 (party's pretrial failure to track down witness whom it knew had information relevant to case foreclosed Rule 60(b)(2) relief); *Washington v. Patlis,* 916 F.2d 1036, 1038–39 (5th Cir.1990) (when plaintiff knew of witness's identity and probable testimony before trial, but did not move for continuance to locate witness, party had "failed to demonstrate due diligence" under Rule 60(b)(2)); 11 Wright, Miller & Kane, *supra,* § 2859, at 305–306 ("[T]he failure to locate a witness prior to trial, who the movant later argues was important to the case, will be treated as a lack of due diligence.").

The parties dispute whether Kettenbach exercised due diligence in discovering

Browne's involvement in the case. Kettenbach's counsel avers that Plaintiffs did not learn of the services provided by Browne's employer until Demoulas's financial records, produced pursuant to this Court's order,[10] revealed payments made to Szpuk's investigative agency. Mark Aff. ¶ 21–22. Plaintiffs did not learn of Browne specifically until Defendant's counsel asked a question mentioning his name at Defendant's deposition of Kettenbach on June 30, 1994. Tr. of Dep. of Michael Kettenbach at 27. At his July 8, 1994, deposition, Demoulas acknowledged that Browne was at DSM conducting an electronic sweep in June 1990. Tr. of Dep. of Arthur S. Demoulas at 36.

Recognizing that the discovery deadline for this case expired on June 30, 1994,[11] Kettenbach filed a motion on July 12, 1994, seeking permission to take Browne's deposition. Demoulas opposed the motion, and, on July 13, 1994, U.S. Magistrate Judge Cohen denied Kettenbach's request. Docket No. 116. Therefore, the trial began on July 25, 1994, without Kettenbach having had an opportunity to question Browne.

Demoulas counters that Kettenbach could have discovered Browne's identity by deposing Demoulas earlier than July 8, 1994. Kettenbach did make such an attempt, however, when Plaintiffs began Demoulas's deposition on November 16, 1990. On the second day of the deposition, Demoulas refused to answer questions relating to certain documents and Plaintiffs' counsel suspended until this Court allowed Plaintiffs' motion to compel answers to deposition questions on June 29, 1994. The deposition at which Demoulas mentioned Browne as one of the persons who helped him with the electronic "sweep" of DSM took place shortly afterwards.

■■■ Defendant treads on thin ice when he argues that Kettenbach could have uncovered Browne's identity had Plaintiffs been more persistent in pursuing depositions and document discovery when several orders of

this Court were necessary to compel discovery to move forward. There is no reason to believe that any deposition of Browne would have produced any information apart from the affidavit. In any event, failure to pursue discovery to the utmost limit does not preclude a successful Rule 60(b)(2) motion. *See Krock v. Electric Motor & Repair Co.,* 339 F.2d 73, 74–75 (1st Cir.) (holding that failure to make full use of discovery does not require a finding of lack of due diligence), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). Moreover, by Browne's own admission, he did his best to evade Kettenbach's attempts to speak with him before trial. Tape Tr. at 52–53. Therefore, the Court finds that Demoulas' failure to locate and depose Browne did not evince a lack of due diligence.

Demoulas also maintains that Kettenbach did not exercise due diligence in questioning Primo before trial and ascertaining her knowledge of Browne's involvement. According to affidavits submitted by Kettenbach, Primo first was identified by one of Kettenbach's investigators on July 26, 1995, the second day of trial. Prum Aff. ¶ 8–10. In a series of meetings that week, investigators determined that Primo had knowledge of Browne's involvement in matters relating to this case but was unwilling to implicate Browne, a close friend of several years. *Id.* at ¶ 10–27.

On or about July 27, Kettenbach's attorneys first were told by investigators of Primo's existence and potential knowledge of wiretapping but did not meet with her for the first time until August 3, 1995, the eighth day of trial. Mark Aff. ¶ 37–40. By that time, Primo evidently had a change of heart because she told the attorneys that "Browne had told her that he had done the 'bugging' for Arthur S. Demoulas." *Id.* at ¶ 40.

Later that day, Kettenbach's investigators discovered that one of the jurors had attempted to solicit bribes to influence the

---

**10.** Magistrate Judge Cohen granted an order allowing Kettenbach's motion to compel in September 27, 1993. Due to a mishap, Kettenbach did not receive notice of this order and did not receive the financial records until May 1994. Thus, the Court does not attribute Kettenbach's failure to acquire these records until the months

immediately preceding trial to any lack of diligence on plaintiffs' part.

**11.** Some depositions noticed before June 30, 1994, however, were taken in July.

outcome of the trial. *Id.* at ¶ 42. This extremely unusual turn of events resulted in a suspension of the trial during an FBI investigation. After the juror was arrested, the Court, together with counsel, conducted individual voir dire examinations of the remaining jurors and all were satisfied that the panel was not tainted by this misconduct. Trial Tr. at 9–15 to 9–39.[12]

Although distracted by this bizarre and unfortunate turn of events, Kettenbach's counsel continued to meet with Primo. Having obtained all information from her on a promise of confidentiality, counsel refrained from coercing her to appear as a witness in the trial. Furthermore, given Primo's reluctance to testify, counsel was then uncertain as to her credibility and had been unable to confirm her story. Mark Aff. ¶ 43–45. Therefore, Kettenbach decided not to subpoena her testimony, and the trial ended without the Court or the jury having heard from Primo. *Id.* at ¶ 49.

Defendant now argues that because Plaintiffs' counsel knew about Primo during the trial but failed to call her as a witness or move the Court for a continuance, Plaintiffs' lack of due diligence warrants denial of their motion. Defendant notes that Rule 60(b)(2) applies only to evidence that is not discoverable within the time frame specified by a Rule 59 motion (i.e., ten days after the entry of judgment). By Plaintiffs' admission, they knew about Primo for nearly three weeks before the entry of judgment after the first trial.

In at least one other case with similar facts, the First Circuit held that the discovery of a potential witness on the eve of trial was not a failure to exercise due diligence under Rule 60(b)(2). In *Duffy,* a late-discovered eyewitness to an automobile accident was not permitted to testify at trial because of the unfair surprise to the opposing party.

857 F.2d at 878. A compromise was worked out whereby the plaintiff would reserve the right to move for a new trial, if necessary, after the jury's verdict. After the jury returned a verdict for the defendant, the district court denied the plaintiff's new trial motion. Reversing the trial court for abuse of discretion, the First Circuit held that "in these rather unique circumstances, [the witness's] potential significance [ ] was too great to have allowed denial of the new trial motion." *Id.* at 881.

*Duffy* and the present litigation are not similar in all respects. In particular, Kettenbach did not bring the existence of this potential witness to the attention of the Court, or ask for a continuance until Primo's information could be independently verified. Although the Court recognizes that Primo's information was given under a promise of confidentiality, failing to disclose information potentially central to a just outcome of the trial was not the most prudent course. In light of the major disruption caused by the juror misconduct, which received statewide headlines, however, this Court as a practical matter would probably not have continued the trial a second time to give Plaintiffs the opportunity to confirm Primo's credibility. The decision not to call Primo at trial without confirming her credibility did not demonstrate a lack of diligence, particularly in light of her less than illustrious background.

The fact that Plaintiffs did not raise Primo's knowledge as one of the grounds for their Rule 59 new trial motion is more troubling, given that she had already told them of Browne's prior admissions of culpability. However, in light of their obligations under Fed.R.Civ.P. 11, Kettenbach's counsel did not have the reasonable opportunity to verify Primo's account and fully assess her credibility within that window.[13]

---

12. The juror, James M. Sullivan, subsequently pled guilty to federal charges in Criminal Action No. 94–10238. Based on Sullivan's conduct, Kettenbach filed a Rule 59 motion for a new trial. In a procedural order dated March 21, 1995, (Docket No. 186), this Court indicated its inclination not to grant the Rule 59 motion based on Judge Lindsay's examination of Sullivan during the plea colloquy. The Court finds that today's order obviates the necessity of deciding Kettenbach's Rule 59 motion on the grounds of juror misconduct or attorney disqualification.

13. Demoulas also contends that Kettenbach waited an unreasonable period of time to file his Rule 60(b)(2) motion. Plaintiffs did, however, meet the outside one-year time limit specified by the Rule. Fed.R.Civ.P. 60(b). In addition, Plaintiffs aver that their counsel attempted after the January 1995 conversation to record subsequent con-

### 3. *The Evidence is Not Merely Cumulative or Impeaching.*

Kettenbach makes this showing with little difficulty. As Defendant points out, Kettenbach's theory at trial was that Kattar installed the listening devices at DSM. Def.'s Opp. at 35–36. Browne's presence at DSM with Demoulas, Szpuk, and Hawks was only briefly mentioned in testimony and closing arguments. *Id.* at 36; Trial Tr. at 9–72 (cross-examination of Hawks); 13–37 to 13–39 (Plaintiffs' closing arguments). Primo's affidavit declaring that Browne admitted "bugging" Kettenbach's offices and the Browne–Primo recorded conversation present an entirely different theory of the case than that offered at trial.

### 4. *The Evidence Would Probably Produce a Different Result.*

This requirement is a "materiality" test. *See Duffy*, 857 F.2d at 879 n. 2. Because Rule 60(b)(2) is aimed at correcting erroneous judgments based on the unobtainability of evidence, the burden is on the party presenting the new evidence to demonstrate that the missing evidence was "'of such a material and controlling nature as [would] probably [have] changed the outcome.'" *Hoult*, 57 F.3d at 6 (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n. 10 (1st Cir.1988)). Of course, for evidence to be of a material and controlling nature it must first be admissible and credible. *See United States v. Walus*, 616 F.2d 283, 302–303 (7th Cir.1980) (evaluating credibility of testimony to determine whether newly discovered evidence warranted relief from judgment); 7 Moore, *supra*, ¶ 60.23[4], at 60–200 to 60–201 (For Rule 60(b)(2) relief to be granted, evidence "must be admissible and credible.")

The recorded Browne–Primo conversation is composed of statements made out-of-court that would be offered for their truth if introduced at trial, and unless the evidence is within one of the exceptions to Fed.R.Evid. 801, it is inadmissible hearsay. Rule 801 exempts from the definition of hearsay, a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy" if offered against a party. Fed. R.Evid. 801(d)(2)(E). Kettenbach argues that Browne's statements are during and in furtherance of a conspiracy among Demoulas, Browne, Szpuk and Hawks to install electronic listening devices at DSM and, later, to cover up their illegal activities. Pl.'s Memo. at 19–20. Demoulas counters that there is no conspiracy and, even if there were, the statements were not made in furtherance of that conspiracy. Def.'s Opp. at 11–22.

In order for statements of a coconspirator to be admissible, "a party who wants to introduce a particular statement must show by a preponderance of the evidence that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." *United States v. Sepulveda*, 15 F.3d 1161, 1180 (1st Cir.1993), *cert. denied*, ––– U.S. –––, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *United States v. Serrano*, 870 F.2d 1, 8 (1st Cir. 1989); *Earle v. Benoit*, 850 F.2d 836, 841 (1st Cir.1988).

Thus the Court must make a preliminary determination as to the existence of a conspiracy, and whether the statements were made in the course and in furtherance of that conspiracy. It is well settled that "the district court makes its determination in accordance with the civil preponderance of the evidence standard" included in Fed. R.Evid. 104(a). *Earle*, 850 F.2d at 841; *see also Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). Although "a coconspirator's statement, standing alone, is insufficient to meet the preponderance standard," *Sepulveda*, 15 F.3d at 1182, the Court may rely, in part, on the proffered statement as well as extrinsic evidence, whether or not admissible. *Earle*, 850 F.2d at 841; Fed.R.Evid. 104(a) ("In making its determination, [the court] is not

versations between Primo and Browne held in April 1995. Mark Aff. ¶ 59. When this attempt failed, Kettenbach's counsel confronted Browne, Szpuk, and Hawks with the tape on June 21, 1995. Plaintiffs motion was filed almost immediately afterwards on June 27, 1995. *Id.* at ¶ 60–61.

bound by the rules of evidence except those with respect to privileges.").

With these standards is mind, the Court turns to the Browne–Primo tape. Browne's statements were made and recorded on January 26, 1995—more than four years after Demoulas, Browne, Szpuk, and Hawks allegedly installed the electronic listening devices at DSM. Therefore, the statements could not have been made in the course and in furtherance of a conspiracy solely to install the "bugs" because "[b]y that time, the objectives of the conspiracy had long since either failed or been achieved." *Serrano,* 870 F.2d at 8 (internal quotation marks and citation omitted). However, Kettenbach advances a theory of a continuing conspiracy to conceal this illegal activity.

In *Krulewitch v. United States,* 336 U.S. 440, 443, 69 S.Ct. 716, 718, 93 L.Ed 790 (1949), the Supreme Court rejected a reading of the co-conspirator exception that would presume that "an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective." The First Circuit in *Serrano* explains that "when the acts of concealment are done after the central objectives have been attained, for the purpose only of covering up after the crime, they are inadmissible." 870 F.2d at 9. In that case, Serrano was involved in a conspiracy with a fellow employee at Shearson to commit complex financial fraud. After the fraudulent scheme was completed, Shearson investigators deposed Serrano, who admitted certain transactions that implicated his co-conspirator. *Id.* at 7. The court held that these statements, made long after the completion of the conspiracy, were not admissible. *Id.* at 8–9.

As the First Circuit indicated, however, *Serrano* "does not mean that acts of concealment can never have significance where they are 'done in furtherance of the main [ ] objectives of the conspiracy.'" *Id.* at 9 (quoting *Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957)). Statements relating past events may be made in furtherance of an ongoing conspiracy to conceal criminal activity. *See United States v. Kaplan,* 832 F.2d 676, 686–87 (1st Cir.1987) (in prosecution for medical insurance fraud, false records maintained to conceal fraudulent claims submitted by physicians were statements that "clearly furthered the main objectives of the conspiracy") (internal quotations and citation omitted), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988); *United States v. Paone,* 782 F.2d 386, 391 (2d Cir.1986) ("[I]n furtherance requirement ... satisfied when a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance."), *cert. denied,* 483 U.S. 1019, 107 S.Ct. 3262, 97 L.Ed.2d 761 (1987); *United States v. Haldeman,* 559 F.2d 31, 110–11 (D.C.Cir. 1976) (during Watergate scandal, statements made among co-conspirators to "identify and shore up loose ends" in association with cover up were admissible), *cert. denied sub. nom., Ehrlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Osticco,* 580 F.Supp. 484, 488 (M.D.Pa.) ("[W]here there is a present concern with continuing a portrayal or impression about past misdeeds, authority exists that narrations of said past events may be in furtherance of a present conspiracy."), *aff'd,* 738 F.2d 424 (3d Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985).

Kettenbach argues that the tape, and certain extrinsic evidence, demonstrate such an ongoing conspiracy to conceal Browne's past misdeeds. Much of the recorded discussion focuses on why Browne had not yet been paid by Demoulas for his past services. Browne tells Primo that he cannot be paid until the "case is over and done"; otherwise, "they'll go and get the cancelled checks, ... and they'll hold them up ..., and they'll say here's the proof." Tape Tr. at 55. Again explaining to Primo why he must be patient, Browne says, "you don't ring the register in until the sale's complete. The sale's not complete. Do you understand what I'm sayin'?" *Id.* at 56. Taken in context with the pending litigation in state court, this statement could demonstrate that Browne had a present interest in concealing the past wiretapping activity. Moreover, Kettenbach suggests that certain of Browne's statements are attempts to ensure that Primo keeps to the

"party line" in talking with Plaintiffs' investigators. *Id.* at 50 (Browne: "They said a lot of things, Chris. Did they tell you that I did those nasty things?").

Unsurprisingly, Demoulas vigorously disputes this interpretation of the conversation. Defendant argues that all of the statements must be read in context of Browne's express denial of wrongdoing. *See id.* at 50 (Browne: "But, Chris, that's what they say. I never did that."). To the extent that Browne admitted being involved in a job with Szpuk and Hawks, he was simply discussing the electronic sweep done at Defendant's office at DSM. According to Demoulas, there is nothing on the tape that can be reasonably construed to be a statement by Browne in furtherance of a conspiracy to conceal wiretapping at DSM.

Indeed, Demoulas argues that, under *Sepulveda,* the taped statements must be accorded little weight. As stated above, *Sepulveda* requires that "to satisfy the weight-of-the-evidence criteria for [the co-conspirator] hearsay exception, there must be some proof *aliunde.*" 15 F.3d at 1182. While the Court does not agree that *Sepulveda* must be read to minimize the probative value of the co-conspirator's statement, some extrinsic evidence is required.

There is, however, extrinsic evidence presented on the record that supports the existence of a conspiracy to conceal the wiretap. First, there is an unpaid invoice from Szpuk's investigative agency to Demoulas in the amount of $4879.30 for consultations and depositions. Def. Ex J. Even if Demoulas's story that Browne, Szpuk, and Hawks simply conducted an electronic sweep at DSM is credited, Kettenbach argues that this invoice clearly understates the services that such an operation would entail. Kettenbach thus contends that the invoice is a "cover" for the conspirators' illegal activities. *Cf. United States v. O'Connell,* 890 F.2d 563, 566–67 (1st Cir.1989) (false invoices admitted under Rule 801(d)(2)(E)). Second, Browne was observed by Kettenbach's investigators to behave in a manner consistent with a conspiracy to conceal after having been confronted with the tape. Browne drove immediately to Szpuk's house at high speed, conferred with a youn-

ger man (possibly Szpuk's son), and sped off once again without responding to Plaintiffs' investigators. McLaughlin Aff. ¶ 9–13; Fidler Aff. ¶ 7–11; Szpuk Aff. ¶ 2–3 (dated Sept. 27, 1995). Third, there is an affidavit from Primo stating that Browne had told her of his involvement in the "bugging" prior to the recorded conversation. Primo Aff. ¶ 3. Fourth, there is undisputed evidence that Browne and the others were seen at DSM headquarters with Arthur during the relevant time period. Finally, the discussions on tape relating to changing the batteries in the listening devices and monitoring from the van are consistent with testimony at trial. Trial Tr. at 6–25 to 6–27.

Demoulas offers evidence that belies the existence of a conspiracy. With regard to the invoice, Defendant provides affidavits showing that the $4879.30 was for time spent in preparing for the deposition and that Demoulas has no intention of paying the bill. Szpuk Aff. ¶ 3–4 (dated July 10, 1995); Demoulas Aff. ¶ 2–3. Similarly, Demoulas argues that on the morning Browne was confronted with the tape, he was working with Szpuk; therefore, it was perfectly natural for him to drive to Szpuk's house. Szpuk Aff. ¶ 3 (dated Sept. 27, 1995). Finally, Demoulas provides an affidavit from Browne stating unequivocally that he did not install electronic listening devices at DSM and did not tell Primo that he had engaged in such conduct. Browne Aff. ¶ 1–3.

In addition, even if such a conspiracy were proven by a preponderance of the evidence, Browne's recorded statements must have been in furtherance of that conspiracy to be admissible. "Because of the in furtherance limitation on the admissibility of a coconspirator's statement, a damaging statement is not admissible under 801(d)(2)(E) unless it tends to advance the objects of the conspiracy as opposed to thwarting its purpose." *United States v. Fahey,* 769 F.2d 829, 839 (1st Cir.1985). A "mere narrative" of past events or "idle chatter" by the co-conspirators does not satisfy this requirement. *See Haldeman,* 559 F.2d at 110–11. However, the statements need not directly advance the conspiracy's goals; it is sufficient if they "reveal an intention to

promote its objectives." *United States v. Crocker*, 788 F.2d 802, 805 (1st Cir.1986). Along these lines, discussions among co-conspirators to get their stories straight, *Haldeman*, 559 F.2d at 110–11; *Osticco*, 580 F.Supp. at 488, or a co-conspirator's misleading statement to a law enforcement officer to throw him off the track, *Fahey*, 769 F.2d at 839, is within the ambit of Rule 801(d)(2)(E). The parties dispute whether Browne's statements represent "idle chatter" or an attempt to further the alleged conspiracy's goals and objectives.

█ Thus, the Court is presented with conflicting evidence upon which it must determine whether Browne's taped statements were made during and in furtherance of a conspiracy to conceal his alleged involvement in installing listening devices at DSM. Based on the current record, the Court concludes that depositions of Primo and Browne would facilitate a decision as to whether Kettenbach has proved the admissibility of these statements by a preponderance of the evidence. Fed.R.Evid. 104(a)–(b).[14]

The Court orders the deposition of Catherine Primo and Edmund J. Browne, Jr., by October 31, 1995.

### B. *Stephen Harvey*

Affidavits presented to the Court contain hearsay statements regarding the knowledge of Stephen Harvey ("Harvey"), who had been living with Primo for a period of two years prior to March 1995. These affidavits purport to demonstrate that Plaintiffs' counsel met extensively with Primo during the trial, and, therefore, could have ascertained her knowledge in time for use at trial. Gerrard Aff.; Cohen Aff.; Long Aff.; Pelusi Aff. Harvey refused to sign an affidavit to this effect; therefore, the affidavits of Demoulas' counsel are unreliable compound hearsay.

The affidavits state, however, that Harvey would answer truthfully if subpoenaed. Gerrard Aff. ¶ 13; Long Aff. ¶ 33; Pelusi Aff. ¶ 20. If credited, Harvey's testimony could lead the Court to reconsider its finding regarding Plaintiffs' due diligence.

Therefore, the Court orders that the deposition of Stephen Harvey be taken by the parties by October 31, 1995.

### ORDER

The depositions of Primo, Browne, and Harvey shall be taken by October 31, 1995. Expedited transcripts shall be ordered. The parties shall supplement their briefs with the transcripts and any additional memoranda by November 17, 1995. After reviewing the depositions, the Court will determine whether an evidentiary hearing is necessary.

---

**14.** In papers recently submitted to the Court, Plaintiffs argue that the Browne–Primo conversation is admissible as a statement against Browne's penal interest under Fed.R.Evid. 804(b)(3). Although the statements, if considered with Primo's affidavit, arguably are self-inculpatory, the Court finds that this avenue for admissibility is closed. First, there is no suggestion that Browne would be unavailable to testify at trial, particularly because he has submitted an affidavit for the record. Second, the Supreme Court recently has held that Rule 804(b)(3) only applies to directly self-inculpatory statements. A narrative that is generally self-inculpatory but does not include any directly self-inculpatory statements is not admissible. *Williamson v. United States*, — U.S. —, —–—, 114 S.Ct. 2431, 2434–38, 129 L.Ed.2d 476 (1994). Much, if not most, of the material on the tape is not directly self-inculpatory. Therefore, the conversation, taken as a whole, is not a statement against penal interest under Rule 804(b)(3).