## GAIL A. CAHALY *vs.* BENISTAR PROPERTY EXCHANGE TRUST COMPANY, INC., & others[1] (and six companion cases[2]).

Suffolk. January 7, 2008. - May 8, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Practice, Civil,* Relief from judgment, Judgment notwithstanding verdict, New trial, Discovery. *Evidence,* Disclosure of evidence. *Judgment,* Relief from judgment. *Fiduciary. Conversion. Fraud. Jurisdiction,* Personal.

In a civil action in Superior Court alleging that one of the defendants (a financial company) aided and abetted a breach of fiduciary duty and aided and abetted conversion on the part of other defendants, the judge properly granted to the financial company judgment notwithstanding the verdict (judgment n.o.v.), where, although the plaintiffs established that the other defendants breached their fiduciary duties to them and converted their funds, the plaintiffs failed to provide evidence for the jury reasonably to conclude that the financial company had actual knowledge of the primary wrongdoing [350-358]; moreover, the judge did not abuse her discretion in granting the plaintiffs a new trial based on evidence that addressed the specific deficiencies in their case that led to the initial grant of judgment n.o.v., where the financial company did not produce relevant documents (or did so in an extraordinarily late fashion) in response to discovery requests, and where a certain affidavit that the defendant did not produce could not by due diligence have been discovered earlier by the plaintiffs, and was not merely cumulative or impeaching, but rather was of such a nature that it would probably change the result were a new trial to be granted, in that it reflected the financial company's knowledge of the other defendants' wrongdoing [358-368].

In the circumstances of a civil action where the plaintiffs moved for posttrial relief pursuant to Mass. R. Civ. P. 60 (b) (2) and were granted a new trial based on newly discovered evidence, the plaintiffs were not entitled to their preferred remedy of reinstatement of the jury verdict, where even

---

[1]Benistar Ltd.; Benistar Employer Services Trust Corporation; Benistar Admin. Services, Inc.; Carpenter Financial Group, LLC; Molly Carpenter; Daniel E. Carpenter; Merrill Lynch, Pierce, Fenner & Smith, Inc.; and U.S. Property Exchange.

[2]Jeffrey M. Johnston *vs.* Benistar Property Exchange Trust Company, Inc., & others. Massachusetts Lumber Company, Inc. *vs.* Benistar Property Exchange Trust Company, Inc., & others. Bellemore Associates, LLC *vs.* Benistar Property Exchange Trust Company, Inc., & others. Joseph Iantosca & others *vs.* Benistar Property Exchange Trust Company, Inc., & others. R & B Enterprises, Inc. *vs.* Benistar Property Exchange Trust Company, Inc., & others. Byron Darling *vs.* Benistar Property Exchange Trust Company, Inc., & others.

after the introduction of the newly discovered evidence, disputed issues of material fact remained, and it was for the fact finder to weigh the credibility of the witnesses and documentary evidence. [368-369]

There was no merit to the claims of certain defendants in a civil action that the judge lacked personal jurisdiction over them, that their motion for a new trial was improperly denied, or that any of their remaining contentions warranted relief. [369]

CIVIL ACTIONS commenced in the Superior Court Department on January 9, 16, 22, and 23, 2001; February 6, 2001; September 20, 2001; and April 30, 2002.

After consolidation, motions to dismiss and for summary judgment were heard by *Margot Botsford*, J.; the case was tried before her, and questions of law were reported by her to the Appeals Court.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*John R. Snyder* (*S. Elaine McChesney, James P. Lucking, & Doreen M. Rachal* with him) for Merrill Lynch, Pierce, Fenner & Smith, Inc., & others.

*Gary R. Greenberg* (*Jack E. Robinson & Brooks L. Glahn* with him) for Benistar Property Exchange Trust Company, Inc., & others.

*Charles Fried & Anthony R. Zelle* (*John E. O'Brien, Jr., & Colleen C. Cook* with them) for the plaintiffs.

MARSHALL, C.J. In this appeal we principally consider two questions: first, whether a Superior Court judge properly granted judgment notwithstanding the verdict (judgment n.o.v.) to a defendant on the ground of an "evidentiary gap" in the plaintiffs' claims, and second, whether she then properly vacated the judgment n.o.v. and allowed the plaintiffs' motions for a new trial based on "newly discovered evidence" that might close that gap. See Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974) (judgment n.o.v.), and Mass. R. Civ. P. 60 (b) (2), 365 Mass. 828 (1974) (postjudgment relief on ground of newly discovered evidence).[3] We affirm.

1. *Procedural background.* The plaintiffs in these consolidated

---

[3]The trial judge treated the plaintiffs' motion, which was styled as a motion for reinstatement of the jury verdict, as a motion for a new trial, allowed the

actions contracted with the defendant Benistar Property Exchange Trust Company, Inc. (Benistar Trust) to hold their funds in escrow while they engaged in tax-advantaged "like-kind" property exchanges in accordance with Internal Revenue Code, 26 U.S.C. § 1031 (2006) (§ 1031).[4] Rather than safeguarding the plaintiffs' funds in escrow accounts — as its fiduciary and contractual duties to the plaintiffs required — Benistar Trust deposited the funds in margin accounts at Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), and later at UBS Paine-Webber Inc. (PaineWebber), and used the funds to engage in high-risk uncovered option trading. Benistar Trust ultimately lost more than $8 million of the plaintiffs' funds.[5]

Beginning in January, 2001, the plaintiffs filed actions against Benistar Trust, Daniel Carpenter (its owner), Molly Carpenter (its managing director and treasurer; Daniel is her husband), Martin Paley (its president), a series of entities affiliated with Benistar Trust that were also controlled by Daniel and Molly Carpenter,[6] Merrill Lynch, and PaineWebber. The plaintiffs asserted claims against all of the defendants, including breach of contract, conversion, breach of fiduciary duty, intentional misrepresentation, and violation of G. L. c. 93A. In addition, the plaintiffs alleged that Merrill Lynch and PaineWebber aided and abetted Benistar Trust's conversion and breach of fiduciary

motion, and granted that relief.

[4]Title 26 U.S.C. § 1031 (2006) allows a seller of property to defer recognition of a capital gain on certain real estate transactions by using the proceeds of the sale to purchase "like-kind" property within 180 days. 26 U.S.C. § 1031(a)(3). In order to take advantage of this rule, the funds must be transferred to an escrow account, qualified trust, or qualified intermediary pending the purchase of replacement property. Benistar Trust advertised itself as a "qualified intermediary" under § 1031.

[5]The jury awarded $8,644,150 in compensatory damages to the plaintiffs, divided in the following way to reflect each plaintiff's losses: Gail Cahaly, $992,230; Jeffrey Johnston, $541,930; Massachusetts Lumber, $3,237,190; Joseph Iantosca, $2,913,306.86; Belridge Corporation, $514,834.14; and Bellemore Associates, $444,659.

[6]Benistar Admin. Services, Inc.; Benistar Employer Services Trust Corporation; Benistar Ltd.; Carpenter Financial Group, LLC; and U.S. Property Exchange. For simplicity, we shall sometimes refer collectively to Benistar Trust, Daniel Carpenter, Molly Carpenter, Martin Paley, and the named affiliated entities as the "Benistar defendants." We shall refer to Daniel Carpenter as "Carpenter."

duty and violated the Connecticut Unfair Trade Practices Act and the New York Consumer Protection Act.[7]

In March, 2002, the trial judge, who presided over nearly the entirety of this litigation in the business litigation session of the Superior Court, allowed the plaintiffs' motion for summary judgment on their claims against Benistar Trust for breach of contract and conversion. In July, 2002, the judge allowed Paine-Webber's motion for summary judgment on the plaintiffs' claims against it. See note 11, *infra*. After fourteen days of trial on the remaining claims, during November and December, 2002, and having heard testimony from more than a dozen witnesses, a jury found Benistar Trust, Carpenter, Molly Carpenter,[8] and Paley liable on all of the plaintiffs' common-law claims. They found Merrill Lynch liable for aiding and abetting conversion, aiding and abetting breach of fiduciary duty, and for violating the New York and Connecticut consumer protection statutes.[9]

However, in February, 2003, the judge allowed Merrill Lynch's motion for judgment n.o.v. on the ground that the plaintiffs had failed, as a matter of law, to present sufficient evidence that Merrill Lynch either had "actual knowledge" of the Benistar defendants' wrongful acts or provided "substantial assistance" to Benistar's wrongdoing, as required under New York law, which controlled the claims.[10] See, e.g., *S & K Sales Co.* v. *Nike, Inc.*, 816 F.2d 843, 847-848 (2d Cir. 1987) (defining ele-

[7]The plaintiffs' various complaints list additional causes of action against Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), and some of the other defendants that were dismissed during the litigation, do not appear to have been litigated, or otherwise have no bearing on this appeal.

[8]The only claim before the jury with respect to Molly Carpenter was breach of fiduciary duty as to three of the plaintiffs: Joseph Iantosca, Belridge Corporation, and Bellemore Associates. The jury found her liable to all three. Not every cause of action was asserted against each of the other Benistar defendants, a fact that has no bearing on this appeal.

[9]After a separate bench trial in March, 2003, the judge found the Benistar defendants, with the exception of Molly Carpenter, liable under G. L. c. 93A, and awarded attorney's fees to the plaintiffs. In September, 2003, after a further separate bench trial, the judge found that it was necessary and appropriate to pierce the corporate veil and extend liability to the remaining Benistar defendants, five corporations controlled by Daniel and Molly Carpenter. See note 6, *supra*.

[10]The judge also granted judgment n.o.v. on the New York and Connecticut statutory claims for reasons derivative of her setting aside the jury's verdicts

ments of aiding and abetting claim under New York law). See also *infra.*

In a posttrial motion, the plaintiffs brought forward evidence that they asserted was "newly discovered" and would address the deficiencies the judge had identified in granting judgment n.o.v. to Merrill Lynch. The judge allowed the plaintiffs' motion for a new trial under rule 60 (b) (2), based on the new evidence. She reported her decision, along with her previous decision to grant judgment n.o.v. to Merrill Lynch, to the Appeals Court, under Mass. R. Civ. P. 64, as amended, 423 Mass. 1410 (1996), see *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 261 n.4 (1993). She also entered a final judgment against the Benistar defendants under Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), from which the Benistar defendants appealed. The Appeals Court considered all issues together, and affirmed. *Cahaly* v. *Benistar Prop. Exch. Trust Co.*, 68 Mass. App. Ct. 668 (2007). Merrill Lynch and the Benistar defendants each filed an application for further appellate review; the plaintiffs filed an opposition. We granted further appellate review.[11]

2. *Factual background.*[12] The jury could have found the following: Benistar Trust was a registered Delaware corporation with a principal place of business in Massachusetts. It was one of a number of business entities set up and controlled by Carpenter, a tax attorney and Connecticut resident. Carpenter was

---

on the aiding and abetting claims.

[11]The plaintiffs' claims against UBS PaineWebber, Inc. (PaineWebber), are not before us. PaineWebber prevailed on those claims in the Superior Court and in the Appeals Court. The plaintiffs neither sought further appellate review of their claims against PaineWebber nor requested, in their opposition to the applications for further appellate review filed by the other defendants, that this court also review their claims against PaineWebber in the event that one or both of the other defendants' applications was allowed. The applications filed by the other defendants (Merrill Lynch and the Benistar defendants) did not seek relief against PaineWebber. See *Bradford* v. *Baystate Med. Ctr.*, 415 Mass. 202, 204 (1993) ("as to a multiple party, multiple issue case . . . a party successful in the Appeals Court [such as PaineWebber] as to whom an application for further appellate review does not seek relief need not be concerned with the proceedings before us involving other parties"); *Ford* v. *Flaherty*, 364 Mass. 382, 386-387 (1973) (plaintiff's claims against third-party defendant not before the court because no further appellate review of any claim against it was sought).

[12]We recite only such facts as are pertinent to our inquiry, reserving recitation of certain facts for later discussion.

the chairman and sole shareholder of Benistar Trust. His wife, Molly Carpenter, was its managing director and treasurer, and Paley, a Massachusetts resident, was its president.[13]

The plaintiffs are individuals and entities who in 2000 entered into written agreements with Benistar Trust in order to secure for themselves the tax benefits of § 1031 in connection with sales and purchases of real estate.[14] See note 4, *supra.* These agreements, in essence, obligated Benistar Trust (1) to hold the funds that each plaintiff derived from the sale of real property in a Merrill Lynch "escrow custodial account" in the form of either a six per cent "investment account" or a three per cent money market account, at each plaintiff's election; (2) to transfer a plaintiff's escrow funds to any seller of "replacement property," designated by the plaintiff at such time and in such manner as the plaintiff specified, see note 4, *supra;* and (3) if the plaintiff failed to locate a suitable replacement property within the time permitted under § 1031, to return the escrow funds, with the applicable interest, to the plaintiff.

In October, 1998, Carpenter opened accounts at Merrill Lynch for various of his enterprises, including four accounts for Benistar Trust. These were corporate working capital accounts, and not custodial, depository, or escrow accounts. His account advisors for all of the Benistar accounts were Gary Stern and Gerald Levine, financial advisors with Merrill Lynch's private client group. In setting up the accounts, Carpenter forwarded to Merrill Lynch Benistar Trust's certificate and articles of incorporation, bylaws, and corporate resolutions authorizing the opening of the accounts. None of these documents identified the nature of Benistar Trust's business as a § 1031 qualified intermediary.[15] Carpenter signed written representations that the money in the

---

[13]At their depositions, the Benistar Trust principals, Carpenter, Paley, and Molly Carpenter invoked their right to remain silent under the Fifth Amendment to the United States Constitution in answer to every question put to them. At her deposition, Molly Carpenter invoked both the "spousal privilege" and "all other applicable privileges"; the judge determined that only the Fifth Amendment protection against self-incrimination applied. At trial, Paley again responded to every question by invoking his Fifth Amendment rights. Carpenter and Molly Carpenter did not appear at trial.

[14]Benistar Trust charged the plaintiffs a flat fee for its services as a § 1031 qualified intermediary.

[15]The Merrill Lynch account opening documents, prepared by Gerald Le-

Benistar Trust accounts belonged to Benistar Trust. Additionally, Carpenter identified his investment objective as "income" and his "account risk factor" as "aggressive." He requested and received permission from Merrill Lynch to engage in uncovered option trading[16] in one of the Benistar Trust accounts, after signing a document acknowledging his understanding that uncovered options posed "special risks . . . [for] potentially significant losses."[17]

Carpenter was, as he stated on the account form, an "aggressive" investor. As soon as the accounts were opened, he engaged in high-volume, high-risk uncovered trading in puts and calls, concentrating almost exclusively in the then-booming technology sector. Carpenter often spent one hour or more each day on the telephone with Levine or Stern discussing possible trades, consuming far more of their time than their other clients. However, Benistar's trades were "totally unsolicited," meaning that Carpenter himself controlled all investment decisions.[18] He paid little heed to Stern's and Levine's repeated admonitions to temper his trading style by broadening his portfolio into other sectors and choosing some safer investments.

Carpenter's investment strategy at first yielded profitable returns, but by the spring of 2000, as the "dot-com boom" of the late 1990's began to flatten out, his accounts sustained

vine and signed by Carpenter and (in some cases) Molly Carpenter, identified the business of Benistar Trust as "real estate transactions" and "real estate," information that Levine testified came directly from Carpenter.

[16]An "uncovered" option strategy involves contracting to buy or sell a particular security, which one does not own, on a date in the future, for an agreed price. Because the actual price of the security on the date when the option expires may be much higher or lower than the agreed price, large gains or losses may result. For uncovered calls, in which one contracts to sell at an agreed price, the potential losses are unlimited.

[17]Although Merrill Lynch authorized Carpenter to engage in uncovered option trading in several Benistar Trust accounts, most of the option trading was done through one Benistar Trust account identified at trial as the "B10 account." For the sake of convenience, we shall refer hereafter to the Benistar Trust "account," in the singular.

[18]As the judge stated in her memorandum of decision and order on the plaintiffs' claims pursuant to G. L. c. 93A, the evidence showed that Carpenter "was unquestionably the person entirely or virtually entirely responsible for authorizing and directing the uncovered option trading with the plaintiffs' funds" at Merrill Lynch.

heavy losses.[19] Merrill Lynch administrative manager Thomas Rasmussen, branch manager Hassan Tabbah, and members of Merrill Lynch's compliance department were concerned about these losses. On September 20, 2000, Rasmussen directed Levine to inform Carpenter that Merrill Lynch would no longer permit Carpenter to open uncovered positions in the Benistar Trust account. On Stern's recommendation, Carpenter moved his accounts to PaineWebber in October, 2000, where, in less than three weeks, Benistar Trust lost between $1.2 and $1.3 million. By the end of December, 2000, PaineWebber began closing out positions in the Benistar account.

We turn now to the decision of the judge to grant Merrill Lynch's motion for judgment n.o.v.

· 3. *Judgment notwithstanding the verdict.* a. *Standard of review.* Because the jury are a pillar of our justice system, nullifying a jury verdict is a matter for the utmost judicial circumspection. The touchstone is reasonableness. We ask whether, construing the evidence most favorably to the plaintiff, and "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could have returned a verdict for the plaintiff. . . . To be reasonable, the inference [or conclusion] 'must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture.' " *Phelan* v. *May Dep't Stores Co.,* 443 Mass. 52, 55 (2004), quoting *Tosti* v. *Ayik,* 394 Mass. 482, 494 (1985), and *McEvoy Travel Bur., Inc.* v. *Norton Co.,* 408 Mass. 704, 706 n.3 (1990). See *Tennant* v. *Peoria & P.U. Ry.,* 321 U.S. 29, 35 (1944). "[We] consider whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn' in favor of the nonmoving party." *Phelan* v. *May Dep't Stores Co., supra,* quoting *McEvoy Travel Bur., Inc.* v. *Norton Co., supra.* With these principles in mind, we turn now to the merits.

b. *Aiding and abetting liability.* The claims against Merrill Lynch for aiding and abetting breach of fiduciary duty and aid-

---

[19]A Merrill Lynch memorandum introduced in evidence notes that Carpenter "was up approximately $200,000 near the end of March 2000 and dropped about $1,000,000 over the option expiration period of April and May."

ing and abetting conversion arise under New York common law, where it is well settled that the plaintiff must show "(i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong." Ryan *vs.* Hunton & Williams, U.S. Dist. Ct., No. 99-CV-5938 (JG) (E.D.N.Y. Sept. 20, 2000). See *S & K Sales Co.* v. *Nike, Inc.*, 816 F.2d 843, 847-848 (2d Cir. 1987); *Mazzaro de Abreu* v. *Bank of Am. Corp.*, 525 F. Supp. 2d 381, 387 (S.D.N.Y. 2007); A.I.A. Holdings, S.A. *vs.* Lehman Bros., U.S. Dist. Ct., No. 97 Civ. 4978 (LMM) (S.D.N.Y. Jan. 23, 2002); *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); Nigerian Nat'l Petroleum Corp. *vs.* Citibank, N.A., U.S. Dist. Ct., No. 98 Civ. 4960 (MBM) (S.D.N.Y. July 30, 1999); Williams *vs.* Bank Leumi Trust Co., U.S. Dist. Ct., No. 96 Civ. 6695 (LMM) (S.D.N.Y. May 30, 1997); *Kolbeck* v. *LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998). See also Restatement (Second) of Torts § 876 (b) (1977) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other . . ."). The plaintiffs have cleared the first hurdle of the evidentiary requirements: establishing that the Benistar defendants both breached their fiduciary duties to them and wrongfully converted their funds. The question is whether they provided evidence sufficient for the jury reasonably to conclude that Merrill Lynch had "knowledge of" and "substantially assisted" the Benistar defendants. Ryan *vs.* Hunton & Williams, *supra.* The plaintiffs concede that the lengthy trial did not yield direct evidence of knowledge or substantial assistance. They argue, however, that the "indirect, circumstantial evidence" of these two elements was "overwhelming." No jury reasoning from the evidence, however, would have been overwhelmed.

c. *Knowledge of a violation.* We first consider whether, viewing the evidence in its light most favorable to the plaintiffs, the jury reasonably could have inferred that Merrill Lynch "knew" of the primary wrongs committed by the Benistar defendants. The knowledge requirement of a New York aiding and abetting

claim demands a showing of "actual knowledge" of the underlying wrongdoing. See *Kolbeck* v. *LIT Am., Inc., supra* at 246, and cases cited. That the aiding and abetting defendant has been proven to have had notice or "constructive knowledge" of the underlying wrong will not suffice. See, e.g., Ryan *vs.* Hunton & Williams, *supra* (on motion to dismiss, allegations that defendant suspected underlying fraud insufficient to aver "actual knowledge"). See also *Kolbeck* v. *LIT Am., Inc., supra* at 248 (absent fiduciary duty to plaintiff, defendants' knowledge of accusations of fraud against primary wrongdoer insufficient to impute requisite "actual knowledge" for purposes of aiding and abetting liability).[20] The plaintiffs are not required to produce a "smoking gun," however. Actual knowledge "may be implied from a strong inference of fraudulent intent," *Mazzaro de Abreu* v. *Bank of Am. Corp., supra* at 388.

On appeal the plaintiffs set out six "categories of evidence" that they argue form the basis of a reasonable inference that Merrill Lynch had "actual knowledge" of the Benistar defendants' underlying wrongdoing. They also argue that the jury could reasonably have inferred actual knowledge from disbelief of the Merrill Lynch defendants' testimony. On both points, we disagree.

As to evidence, the plaintiffs rely strongly on a September 22, 2000, letter Carpenter wrote to Rasmussen, protesting Merrill Lynch's decision to prohibit opening new positions in the Benistar Trust account.[21] In the letter Carpenter stated, among other things: "We have chosen Merrill [Lynch] as our deposi-

---

[20]It is uncontested that Merrill Lynch did not owe a fiduciary duty to the plaintiffs. See *Morin* v. *Trupin*, 823 F. Supp. 201, 207 (S.D.N.Y. 1993) (broker of packaged real estate deals does not owe fiduciary duty to plaintiffs where he had "no control" over materials forming basis of primary tortfeasor's fraud).

[21]In the September 22, 2000, letter, Carpenter stated that he was writing "to lodge an official complaint" about Merrill Lynch's prohibiting Benistar Trust from opening new positions. There was considerable testimony at trial about whether the letter constituted the type of complaint that was required to be reported to the Securities and Exchange Commission (SEC). Robert Lau, an expert testifying on behalf of Merrill Lynch, Rasmussen, and Duffy, and the Merrill Lynch attorney to whom he referred the letter all testified that the letter was not the type of complaint required to be reported to the SEC. The judge, correctly in our view, rejected the plaintiffs' argument that the Merrill Lynch defendants' testimony on this matter was false and therefore probative evidence of liability, see *Boston* v. *Santosuosso*, 307 Mass. 302, 349 (1940), on the ground that testimony about whether the letter constituted a reportable

tory for our clients so we cannot move the funds elsewhere. If we cannot trade at Merrill [Lynch], we cannot trade anywhere, and you will have doomed us to our losses in a volatile market that we were perfectly positioned to profit from." To the plaintiffs, the words "depository" and "clients" were sufficient to inform Merrill Lynch that the Benistar Trust account contained third-party funds *and* that Carpenter was appropriating those funds for his own use in violation of his fiduciary duty to the third parties.[22,23] The link posited by the plaintiffs requires many intermediate conclusions for which there was no evidence: for instance, that the funds in the Benistar Property account were third-party funds contractually required to be held in escrow and that Benistar Trust's agreements with the third parties did not permit using the funds for speculative trading. Even assuming, arguendo, that the letter signified that Benistar Trust had some unspecified fiduciary duty to third-party clients relevant to the corporate accounts, the "relevant 'knowledge' for liability to attach in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary *and* knowledge that the primary's conduct contravenes a fiduciary duty" (emphasis added). A.I.A. Holdings, S.A. *vs.* Lehman Bros., *supra*, quoting

complaint was "confusing" and that, in any event, had Merrill Lynch reported the letter as a "complaint," the form in which it was required to do so would not have triggered further investigation by any regulatory authority "or anyone else."

[22]In further support of this assertion, the plaintiffs point to evidence from a section of the Merrill Lynch "Compliance Outline" (an internal document distributed to brokers in its private client division) on "Money Laundering, Con Games and Trading Abuses" that advises brokers to avoid schemes using "intermediate" or "depository" accounts. The reference does not define "depository" but does indicate that such accounts are held for the benefit of third parties. In any event, it is insufficiently revelatory of the tortious conduct at issue reasonably to lead to an inference that Merrill Lynch had "actual knowledge" of the Benistar defendants' wrongs.

[23]It is undisputed that, based on the *trial evidence*, no one at Benistar Trust directly informed anyone at Merrill Lynch that the funds in the Benistar Trust account belonged to third parties and that Carpenter was misusing those funds in violation of his agreements with those third parties. Levine, Rasmussen, Stern, and Duffy testified that Carpenter had told them that the money in the accounts was all his. Moreover, Rasmussen, Levine, and Merrill Lynch attorney Kevin Duffy all testified, without contradiction, that they considered the reference to "clients" to mean Carpenter's or Benistar's other companies. Stern and Levine also testified that they considered Benistar Trust and Carpenter to be one and the same for purposes of the Merrill Lynch accounts.

*Diduck* v. *Kaszycki & Sons Contrs.*, 974 F.2d 270, 282-283 (2d Cir. 1992). It takes a leap in speculation, an impermissible leap for a jury, to tie the September 22 letter to Merrill Lynch's "actual knowledge" of the underlying tortious behavior. See *Sheehan* v. *Goriansky*, 317 Mass. 10, 17 (1944), quoting *Davis* v. *Boston Elevated Ry.*, 222 Mass. 475, 479 (1916) (jury's conclusion must be "the result of logical reasoning from established facts").

The plaintiffs' second category of evidence is similarly unpersuasive. This category of evidence is comprised of Rule 405 of the Rules of the New York Stock Exchange, Rule 3210 of the Rules of the National Association of Securities Dealers, and Merrill Lynch compliance policies that, in summary, require a broker or financial adviser to use "due diligence" to "know the client" when opening and managing the client's investment accounts. The plaintiffs argue that, because Stern and Levine both testified that they complied with the "know your client" rules, the jury reasonably could conclude that Stern and Levine, and thus Merrill Lynch, knew about the nature of Benistar Trust's business[24] and also the nature of its wrongdoing.[25] The jury might have believed Stern's and Levine's testimony that they followed the "know your client" rules, in which case the jury reasonably could infer that Stern and Levine knew the nature of Benistar Trust's services. Or the jury might have disbelieved the brokers, in which case they reasonably could infer that Stern and Levine failed to follow the "know your client" rules. Neither alternative translates to affirmative evidence that Merrill Lynch had actual knowledge that the Benistar Trust account contained third-party funds, and that Carpenter's high-risk options trading in the Benistar Trust account was in breach of its fiduciary duties.

---

[24]Several witnesses for Merrill Lynch testified that not only did they not know the actual nature of Benistar Trust's business as a "qualified intermediary" under § 1031, but they also had no understanding of § 1031 or its requirements until the first of the plaintiffs' lawsuits was filed in January, 2001.

[25]The plaintiffs also argue that the words "property exchange" and "trust" in Benistar Trust's corporate name was a loud, clear announcement to Merrill Lynch of the nature of Carpenter's business and of the underlying tortious conduct. The references in Benistar Trust's corporate name are insufficient under New York law to support the scienter requirement of an aiding and abetting claim.

Third, the plaintiffs laid before the jury voluminous documentary evidence of wire transfer authorizations and wire transfer confirmations for the Benistar Trust account that indicated that substantial sums flowed constantly between Benistar Trust and various third-party bank accounts, attorney trust accounts, and other accounts of an evidently custodial nature.[26] A jury may well have agreed with the plaintiffs that Merrill Lynch's apparent indifference to the large volume of wire transfers was in derogation of its own written policies for detecting "con games" and "scams"[27] (although, as the judge noted, the heavy traffic in wire transfers in the Benistar Trust account was consistent with Carpenter's alleged representations to Merrill Lynch that Benistar Trust bought and sold real estate). At most, this conclusion leads reasonably to the inference that Merrill Lynch "should have been aware" of possible wrongdoings in the account. However, constructive knowledge is not "actual knowledge." See, e.g., *Mazzaro de Abreu* v. *Bank of Am. Corp.*, 525 F. Supp. 2d 381, 388 (S.D. N.Y. 2007) (knowledge of nature of transfers from bank account and large sums of money in account do not imply "actual knowledge of the underlying fraud"); Ryan *vs.* Hunton & Williams, U.S. Dist. Ct., No. 99-CV-5938 (JG) (E.D.N.Y. Sept. 20, 2000) (bank officer's authorization of large volume of transfers between primary defendant's account and subaccounts does "not create an inference of knowledge of" fraudulent scheme). See also Nigerian Nat'l Petroleum Corp. *vs.* Citibank, N.A., U.S. Dist. Ct., No. 98 Civ. 4960 (MBM) (S.D.N.Y. July 30, 1999) (allegations of knowing or reckless disregard of irregularities in wire transfers and other "badges of fraud" do not give rise to inference, "let alone a 'strong inference' " of underlying fraud).

Fourth, the jury heard testimony concerning a telephone conference call on December 19, 2000, among Stern, PaineWebber

---

[26]The plaintiffs also introduced evidence that Merrill Lynch brokers were instructed that large volumes of wire transfer activity in an account may signal a fraudulent scheme and should be reported to the office of the general counsel.

[27]In addition, a jury may well have agreed that such indifference violated Merrill Lynch's obligations under Rule 405 of the Rules of the New York Stock Exchange to "[u]se due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried . . . ."

compliance manager Lori Enright, Mitchell Rock (Stern's close friend and Benistar's broker at PaineWebber),[28] and Steven Feit (the PaineWebber branch manager) in response to PaineWebber's concern about losses in the Benistar account. Enright took notes of the conference. Both Feit's testimony (in deposition) and Enright's testimony and notes reflect that Stern told them that Benistar Trust acted "as a third party liaison for real estate transactions."[29] From what we have said above, it is clear that Stern's information is insufficient to prove actual knowledge of Benistar Trust's fraudulent schemes.

We need not discuss at length the plaintiffs' two remaining categories of evidence. Testimony from several Merrill Lynch employees that they viewed the Benistar Web site homepage (which did not contain a description of Benistar Trust's business) and a linked page that had nothing to do with § 1031 like-kind exchanges has no probative value in establishing Merrill Lynch's knowledge of the primary wrongdoing.[30] That Levine and Stern chose to respond to a memorandum from their compliance department requesting more information about Benistar Trust by ignoring the request and praising Carpenter as an individual cannot be converted into affirmative evidence of the underlying fraud, even if, as the plaintiffs maintain, Levine and Stern responded obliquely in order to continue reaping substantial commissions from Benistar. See *Mazzaro de Abreu* v. *Bank of Am. Corp.*, *supra* at 388-389 (allegations of "profit motive" — garnering of "substantial" transaction fees — insufficient of itself to support inference of actual knowledge of underlying fraud generating fees).

The indirect, circumstantial evidence amassed at trial may suggest that Merrill Lynch knew the nature of Benistar Trust's

---

[28]Rock's participation in the conference call was confined to making introductions.

[29]Enright and Feit also testified that they did not ask Carpenter to elaborate on this description.

[30]Referring to Benistar's Web site, Hassan Tabbah testified without elaboration that he "hit the website," perhaps in Stern's presence. Stern testified that he merely glanced at the Web site once when he was in Tabbah's office, and Levine testified that the only link on the Benistar Web site that he visited concerned an unrelated tax strategy. These witnesses denied seeing any information on the Web site concerning Benistar Trust's role as a qualified intermediary for § 1031 plans.

business. But it does not erase the evidentiary lacunae between Merrill Lynch's knowledge of Benistar Trust's services and knowledge that Benistar Trust was violating its fiduciary agreements to clients and converting client funds by trading in the Benistar Trust corporate account. Crucially, no evidence of Merrill Lynch's actual knowledge of Benistar's agreements with its clients was presented at trial. Cf. Cronin *vs.* Executive House Realty, U.S. Dist. Ct., No. 80 Civ. 7254 (S.D.N.Y. May 5, 1982) (judgment n.o.v. not appropriate on claim for aiding and abetting under New York law where bank official was informed by one business partner that offering memorandum on which "loan write-up" was based misrepresented another partner's financial status).

Because the six categories of evidence do not support a permissible inference of actual knowledge, the plaintiffs gain nothing by claiming that their evidence acquires "independent, confirmatory force" when considered in light of the jury's presumed disbelief of the "implausible," "self-serving" and "after-the-fact" testimony of Merrill Lynch witnesses on key points. Nor can a jury's disbelief of the Merrill Lynch testimony reasonably be viewed as independent affirmative evidence supporting a conclusion that Merrill Lynch had the requisite actual knowledge of the Benistar defendants' wrongful actions. None of the cases the plaintiffs rely on helps their cause.[31] There was no error.

d. *Substantial assistance of the wrongful conduct.* The judge

---

[31]See *Janigan* v. *Taylor,* 344 F.2d 781, 784-785 (1st Cir. 1965) (evidence that, among other things, defendant was in charge of corporation and had detailed knowledge of its operations permitted jury to infer defendant's full knowledge of company's affairs from disbelief of his testimony of ignorance). See also *Sheehan* v. *Goriansky,* 317 Mass. 10, 16-17 (1944) ("The defendant urges that disbelief of testimony was not evidence to the contrary. . . . There was, however, more than mere disbelief of the defendant," including evidence of bloody glove on the deceased's chest); *Boston* v. *Santosuosso,* 307 Mass. 302, 349 (1940) ("disbelief of evidence is not the equivalent of affirmative evidence to the contrary. But where a material fact is established by evidence *and* it is shown that a defendant's testimony as to that fact was wilfully untrue, this circumstance not only furnishes a ground for disbelieving other testimony of this defendant . . . but also tends to show consciousness of guilt or liability on his part and has probative force in connection with *other* evidence on the issue of such guilt or liability" [emphases added]); *Commonwealth* v. *Geisler,* 14 Mass. App. Ct. 268, 274 (1982), quoting *Commonwealth* v. *Porter,* 384 Mass. 647, 653 (1981) (jury could fairly infer evidence of guilt from disbelief of automobile accident defendant's testimony

also concluded that the plaintiffs had failed to prove the third prong of a New York aiding and abetting claim: that Merrill Lynch substantially assisted in furthering the Benistar defendants' wrongful conduct. See Ryan *vs.* Hunton & Williams, *supra.* Our conclusion that the plaintiffs have not met their burden of showing that Merrill Lynch had actual knowledge of the Benistar defendants' underlying tortious conduct on the evidence adduced at trial, and our affirmance of the judge's order allowing a motion for a new trial on the claims against Merrill Lynch, make it unnecessary to address the issue of substantial assistance.[32]

We consider now whether the judge properly ordered a new trial on the claims against Merrill Lynch.

4. *New trial under Mass. R. Civ. P. 60 (b) (2).* In a posttrial motion, the plaintiffs brought forward evidence that they argued addressed the specific deficiencies in their case that led the judge to allow Merrill Lynch's motion for judgment n.o.v. We conclude that the judge did not abuse her discretion in granting the plaintiffs a new trial based on this evidence.

a. *Discovery.* The plaintiffs' request for posttrial relief must be situated in the context of the contentious discovery disputes which marred this litigation, and in which Merrill Lynch repeatedly and over a considerable period before, right up to and during the trial failed to meet its discovery obligations despite multiple and focused discovery requests of the plaintiffs.

Merrill Lynch produced a limited, initial set of documents in

---

where physical evidence such as location and condition of automobile, among other things, supported probable inference of liability; "[w]hile proof of mere consciousness of guilt alone may be insufficient to convict of crime . . . evidence of such a state of mind when coupled with other probable inferences, may be sufficient to amass the quantum of proof necessary to prove guilt"). See Cronin *vs.* Executive House Realty, U.S. Dist. Ct., No. 80 Civ. 7254 (S.D.N.Y. May 5, 1982) (evidence of direct communication to aiding and abetting defendant of concerns about primary defendant's solvency and authority leads to inference that aiding and abetting defendant's actions in failing to conduct normal credit checks and accepting certain promissory notes furthered wrongdoing). Here, as described above, the plaintiffs failed at trial to produce the affirmative evidence that would have allowed a reasonable inference of actual knowledge to be drawn.

[32]Our decision on the aiding and abetting claim makes it unnecessary to address the plaintiffs' parenthetical argument that the jury's verdicts in favor of the plaintiffs on the New York Consumer Protection Act and the Connecticut Unfair Trade Practices Act should be reinstated on the evidence presented concerning aiding and abetting.

March, 2001, in response to two subpoenas duces tecum from the plaintiffs.[33] However, Merrill Lynch then refused to answer the plaintiffs' interrogatories and document requests for the six months from October, 2001, until a motion to compel was allowed in March, 2002, first arguing that it was not subject to interrogatories or document requests because it was not yet a party defendant, and later arguing that it was not subject to such requests because "by the time Merrill Lynch was made a party . . . the deadline for discovery had already clearly passed."[34]

The judge allowed the plaintiffs' motion to compel Merrill Lynch to respond to written discovery in March, 2002.[35] This was not the end of the matter, however. Merrill Lynch's refusal to produce certain other documents, in particular its policy and procedure manuals, led to additional rounds of increasingly specific motions to compel production.[36] Numerous documents

[33]At the time of this initial document production, which Merrill Lynch's counsel later stated in an affidavit "was handled by a paralegal employed by Merrill Lynch," Merrill Lynch was not yet named as a defendant in the case. Merrill Lynch was initially a reach and apply defendant and a trustee process defendant in two of the consolidated actions. The plaintiffs moved to amend their complaint to add Merrill Lynch as a party defendant in September, 2001; the motion was allowed in January, 2002.

[34]Merrill Lynch's position was that the plaintiffs should be afforded *no* opportunity to serve Merrill Lynch with interrogatories or document requests because Merrill Lynch was not named as a party until after the expiration of a deadline set by a scheduling order that predated Merrill Lynch's involvement as a party defendant in the case.

[35]The judge required that the plaintiffs, if they in fact chose to seek written discovery from Merrill Lynch, submit to any written discovery requests by Merrill Lynch as well.

[36]The plaintiffs filed an emergency motion to compel production of, inter alia, Merrill Lynch's policy and procedure manuals, in June, 2002; this motion was allowed in part over Merrill Lynch's opposition. Other parts of the order allowing this motion were modified after an emergency motion for reconsideration by Merrill Lynch was granted in part and denied in part, but Merrill Lynch specifically was required to produce "any such manuals, or portions of manuals, that are responsive to [specifically numbered] requests." In October, 2002, the plaintiffs filed yet another motion to compel Merrill Lynch to produce its policy and procedure manuals for inspection and copying, which Merrill Lynch again opposed on the ground that it already had responded adequately by making available some portions of its manuals. This resulted in yet another order from the judge, less than one month before trial, specifically ordering that the plaintiffs' counsel be permitted to inspect, and copy relevant portions of, two particular manuals.

responsive to the plaintiffs' requests for Merrill Lynch's records concerning the Benistar account were not produced by Merrill Lynch until much later — in some cases, until the middle of the trial. Meanwhile, Merrill Lynch fought a separate battle on the issue of depositions.[37]

On the eve of trial in late November, 2002, Merrill Lynch produced additional relevant documents concerning its internal review of the Benistar account.[38] On the second day of trial, Merrill Lynch disclosed information about the expected testimony of one of its witnesses, Rasmussen, the Merrill Lynch employee who had made the decision to shut down the Benistar account, and whom the plaintiffs had unsuccessfully attempted to depose in advance of trial. This information led the plaintiffs to suspect that Rasmussen's files, which should have included documents concerning Merrill Lynch's supervision of the Benistar account, had not been produced to the plaintiffs. The plaintiffs therefore moved for the immediate production of those documents, along with those of another witness.

On Sunday, December 1, 2002, at around 8 P.M., after pretrial motions and the first five days of trial, and with testimony set to resume the next morning after a Thanksgiving hiatus, Merrill Lynch transmitted additional documents by facsimile to the plaintiffs. These documents, and more that Merrill Lynch produced the next morning as the trial resumed, included documents related to Merrill Lynch's supervision of the Benistar account that Merrill Lynch admitted it previously had not

[37]Merrill Lynch allowed the plaintiffs to depose its employee Stern in October, 2001, but fought the plaintiffs' attempts to depose other witnesses whom the plaintiffs learned were involved in Merrill Lynch's supervision of the Benistar account. Merrill Lynch unsuccessfully opposed the plaintiffs' motion to compel depositions from two key employees, Levine and Tabbah; this motion to compel was allowed and the depositions taken in February, 2002. The plaintiffs' motion to compel the deposition of an additional employee, Rasmussen, who proved to be an important witness at trial, was denied.

[38]The plaintiffs characterized these documents as "new" computer printouts showing Merrill Lynch's reviews of the Benistar account, naming new individuals at Merrill Lynch not previously known to the plaintiffs who were involved in those reviews. Merrill Lynch argued that these documents previously had been made available to the plaintiffs at a witness deposition. Resolving this dispute would require additional documents that are not part of the record on this appeal.

produced.[39],[40] The plaintiffs argued that these documents, which contained "many new names" the plaintiffs previously had not seen, and some of which concerned Merrill Lynch's internal compliance review of the Benistar account, fell within not only the plaintiffs' discovery requests dating back to 2001, but also multiple motions to compel production that the judge had allowed.

It is undisputed that even after this additional extraordinarily late round of document production, Merrill Lynch at no time produced the documents described below, which became the subject of the plaintiffs' rule 60 (b) (2) motion for a new trial.

b. *Mass. R. Civ. P. 60 (b) (2).* The purpose of rule 60, which governs posttrial relief, is "to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice should be done." 11 C.A. Wright, A.R. Miller, & M.K. Kane, Federal Practice and Procedure § 2851 (2d ed. 1995). A party seeking postjudgment relief on grounds of "newly discovered evidence" invokes rule 60 (b) (2), and must satisfy four requirements: "(1) the evidence has been discovered since the trial; (2) the evidence could not by due diligence have been discovered earlier by the movant; (3) the evidence is not merely cumulative or impeaching; and (4) the evidence is of such a nature that it would probably change the result were a new trial to be granted." *United States Steel* v. *M. DeMatteo Constr. Co.*, 315 F.3d 43, 52 (1st Cir. 2002), citing *Mitchell* v. *United States*, 141 F.3d 8, 18 (1st Cir. 1998).[41]

The trial judge "typically has an intimate, first-hand know-

[39]An affidavit of plaintiffs' counsel avers that there were approximately 140 pages of documents not previously produced by Merrill Lynch. The judge called for an affidavit from Merrill Lynch to explain why the document production was so late.

[40]Among the new documents, the plaintiffs found particularly significant a facsimile cover sheet from Benistar to Merrill Lynch stating, "Here's the account selection," which the plaintiffs argued was referring to, and would have enclosed, an account selection form from a Benistar client, in which the client specified its choice of the type of "account" in which Benistar was to hold its funds at Merrill Lynch. Merrill Lynch disputes that there was any account selection "form" associated with this document.

[41]Rule 60 (b) (2) of the Massachusetts Rules of Civil Procedure, 365 Mass. 828 (1974), is the same as Fed. R. Civ. P. 60 (b) (2). "In construing our rules of civil procedure, we are guided by judicial interpretations of the cognate Federal rule 'absent compelling reasons to the contrary or significant differ-

ledge of the case, and, thus, is best positioned to determine whether the justification proffered in support of a [r]ule 60 (b) motion should serve to override the opposing party's rights and the law's institutional interest in finality." *Karak* v. *Bursaw Oil Corp.*, 288 F.3d 15, 19 (1st Cir. 2002). "Consequently, we defer broadly to the [judge's] informed discretion in granting or denying relief from judgment, and we review [the] ruling solely for abuse of that discretion." *Id.* This deferential standard is particularly appropriate where, as here, the judge who ruled on the rule 60 (b) (2) motion is not only the same judge who presided over the trial, but also the same judge who presided over the discovery phase of the litigation and so was intimately familiar with the parties' discovery conduct.

c. *Newly discovered evidence: Patterson.* The newly discovered evidence submitted by the plaintiffs was twofold: an affidavit and accompanying exhibits submitted by a Massachusetts attorney not affiliated with the litigation and an affidavit submitted by the defendant Paley. The more significant of these was the affidavit and accompanying exhibits provided by attorney David Patterson of Newton. In 1998, Patterson represented an individual who sought to effectuate a § 1031 transaction, and who retained Benistar as the qualified intermediary for the property exchange.[42] According to findings of fact of the judge, between October 21 and 23, 1998, Patterson communicated several times by telephone and in writing with Merrill Lynch's Levine in order, in Patterson's words, to "make sure specifically that Merrill Lynch understood that these were escrow funds, and that [Merrill Lynch had] a general understanding of how this transaction was meant to work."[43] Levine was not a mere passive recipient of information from Patterson. He actively sought to respond to Patterson's concerns. On October 22, Le-

ences in content.' " *Doe* v. *Senechal*, 431 Mass. 78, 81 n.8, cert. denied, 531 U.S. 825 (2000), quoting *Rollins Envtl. Servs., Inc.* v. *Superior Court*, 368 Mass. 174, 179-180 (1975).

[42]Patterson's client is not a party in these cases. She has asserted no claims against Benistar Trust or the other defendants.

[43]In connection with their motion, the plaintiffs submitted Patterson's billing records, which show telephone calls with Levine on October 21 and 22, 1998. The plaintiffs also submitted the written communications between Levine and Patterson, including a facsimile signed by Levine.

vine responded to a request from Patterson by transmitting to him some account forms by facsimile. The next day, Patterson sent Levine, both by mail and by facsimile transmission, a copy of the escrow agreement that his client had signed with Benistar regarding the funds to be kept at Merrill Lynch, and a copy of the exchange agreement that his client had signed with Benistar and the seller of the property she was purchasing through the § 1031 transaction, along with a cover letter. The escrow agreement, which is titled "Escrow Agreement" in bold capital letters, explains in some detail that Patterson's client, in order to effectuate a § 1031 property exchange, "will be depositing with Benistar an amount of funds to be deposited in the Benistar accounts at Merrill Lynch," and that these funds are to be held in an "escrow custodial account" at Merrill Lynch for the benefit of Patterson's client. The exchange agreement makes abundantly clear the nature of the § 1031 transaction and Benistar's role as an intermediary.[44]

Years after Patterson's client's transaction was completed, Patterson saw a newspaper article in the Boston Globe about the trial and subsequent proceedings in this case and, with his client's permission, contacted the plaintiffs' counsel. In March, 2004, he provided an affidavit attesting to his communications with Levine, along with copies of the written communications and telephone and billing records indicating the relevant telephone calls and corroborating the dates of the facsimiles.

The import of this evidence is readily apparent. Far from being merely cumulative or impeaching, it cuts to the heart of Merrill Lynch's argument in its successful motion for judgment n.o.v. that Merrill Lynch had no "actual knowledge" of the nature of Benistar Trust's business or the nature of its misdeeds. In a May, 2002, pretrial affidavit in support of Merrill Lynch's motion for summary judgment, and again at trial, Levine denied knowing any of these facts about Benistar Trust's business during the relevant period; Levine also pointedly denied having any contact with any of Benistar Trust's clients in

[44]Patterson sent these agreements to Levine shortly after Carpenter opened the Benistar account in October, 1998. Stated differently, from almost the beginning, Merrill Lynch's employee Levine had knowledge of the nature of Benistar Trust's business.

Massachusetts.[45] Moreover, Levine testified at trial that, if he had been aware that the Benistar Trust account held third-party or client funds, Merrill Lynch would not have permitted Benistar Trust to open corporate accounts or to engage in option trading with the funds. In light of subsequent developments, it would be reasonable for a jury not to credit this testimony.[46] In allowing Merrill Lynch's motion for judgment n.o.v., the judge found that there was "no dispute" that "no one at Merrill Lynch ever saw any of the written agreements" that would have revealed that the funds were being held in escrow for the benefit of the plaintiffs, to whom Benistar Trust owed a fiduciary duty as an intermediary, a conclusion that cannot be sustained in the face of the Patterson evidence.[47]

The Patterson evidence, if believed, shows what Merrill Lynch knew about Benistar Trust's business, its arrangements with its clients, and its misdeeds, allowing a jury to find, in the judge's words, that Merrill Lynch "knew one or more of the other defendants was or were breaching fiduciary duties owed to clients, converting client funds, or both." The judge found the Patterson evidence credible and persuasive. In light of that, she made specific findings that Merrill Lynch was in direct com-

[45]In his pretrial affidavit, Levine specifically stated that he "had no communications or other contact with *anyone* in Massachusetts in connection with any of the Benistar accounts" (emphasis added). Counsel for Merrill Lynch repeatedly emphasized this point to the jury. In his opening argument, he stated that "[n]o one ever called Merrill Lynch" and no "documents . . . were ever provided to Merrill Lynch" that would have revealed that "this was third-party money." In his closing argument, he again emphasized that none of the plaintiffs ever had communicated with Merrill Lynch: "All it would have taken was one telephone call to Merrill Lynch by one of these plaintiffs to alert Merrill Lynch to what was going on . . . That call never came." Although Patterson's client was not a plaintiff, the judge found that his telephone call alerted Merrill Lynch in precisely this way to the fact that Benistar was trading with the funds of clients to whom it owed a fiduciary duty.

[46]See notes 47 and 51, *infra.*

[47]After the plaintiffs brought forward the Patterson evidence, Levine averred in an amended affidavit that "it appears that I sent a facsimile in October 1998 to a David Patterson." Levine no longer denied all contact with Patterson. Levine continued to deny receiving from Patterson the escrow and exchange agreements and Patterson's cover letter of October 23, 1998. However, the letter bore Levine's correct facsimile number and address, and the judge found that Patterson in fact sent both the cover letter and the escrow and exchange agreements to Levine.

munication with the Massachusetts representative of at least one Benistar client, and that in the course of this communication, that representative (Patterson) sent Merrill Lynch multiple copies of the legal agreements specifying Benistar's role as an intermediary holding third-party funds in escrow in its account at Merrill Lynch. In addition, the judge found that, notwithstanding Levine's amended affidavit testimony to the contrary, see note 47, *supra*, in fact Patterson did explain to Levine, in a telephone conversation, both the nature of a § 1031 exchange and the fact that Patterson's client's funds would be held in escrow at Merrill Lynch in the Benistar account. She concluded that such evidence satisfied the requirements of rule 60 (b) (2). It "is not merely cumulative or impeaching" and "is of such a nature that it would probably change the result were a new trial to be granted," satisfying the third and fourth requirements of the rule. *United States Steel* v. *M. DeMatteo Constr. Co.*, 315 F.3d 43, 52 (1st Cir. 2002).

We reject Merrill Lynch's contention that the Patterson evidence was not, in fact, "discovered since the trial" or, in the alternative, that it could "by due diligence have been discovered earlier by the movant." *Id.* The basis for both of these claims is the undisputed fact that the cover letter from Patterson to Levine was in the plaintiffs' possession before trial. It was not Merrill Lynch that produced this document, or any other record of Levine's communications with Patterson. A copy of the cover letter sent by Patterson to Levine was produced by Paley in response to the plaintiffs' pretrial document request.[48] In any event, as the judge noted, the cover letter, by itself, would not establish "actual knowledge" on the part of Merrill Lynch.[49] It is Patterson's affidavit, which details his oral and written communications with Merrill Lynch, that gives the document Paley

---

[48]The cover letter was addressed to Levine, but a notation on the letter indicates that copies without enclosures were also to be sent to Carpenter and Paley. To date, only the Paley copy of the cover letter, along with an accompanying facsimile cover sheet addressed to Paley, has been produced by any of the defendants. The judge noted that Paley produced this document "as part of a supplemental response to plaintiffs' repeated document requests and motions to compel production of documents."

[49]The judge also noted that, by itself, the cover letter would not be admissible in evidence against Merrill Lynch.

produced in discovery its meaning and force. It is undisputed that the Patterson affidavit itself, along with the escrow agreement, the § 1031 property exchange agreement, and the records of telephone conversations and facsimiles that together comprise the Patterson evidence, have all been discovered "since the trial." Merrill Lynch's sweeping statement that "the 'newly' discovered Patterson documents had been produced to and were in possession of plaintiffs' counsel" before trial is far from accurate.[50]

We also agree with the judge that the plaintiffs met their burden of showing that the Patterson evidence could not by due diligence have been discovered earlier by the movant. Parties to litigation are required to exercise due diligence in the search for relevant information, but the degree of diligence required to satisfy the strictures of rule 60 (b) (2) is not unlimited. See *Kettenbach* v. *Demoulas*, 901 F. Supp. 486, 495 (D. Mass. 1995) ("failure to pursue discovery to the utmost limit does not preclude a successful Rule 60 [b] [2] motion"), citing *Krock* v. *Electric Motor & Repair Co.*, 339 F.2d 73, 74-75 (1st Cir.), cert. denied, 377 U.S. 934 (1964) (failing to make full use of discovery does not require finding of lack of due diligence).

This is not a case where the movant under rule 60 (b) (2) failed to make the discovery requests of the nonmoving party that would have yielded the evidence before trial. See, e.g., *Zurich N. Am.* v. *Matrix Serv., Inc.*, 426 F.3d 1281, 1290 (10th Cir. 2005) (documents not newly discovered when plaintiff knew documentation was missing "almost a year prior to the start of trial," made "no attempt to explicitly include it" in the discovery process, and abandoned its requests for the documents for over one year). This is not a case where the movant failed to exercise due diligence by failing to call an important witness of whom the moving party was aware before trial, see *Parilla-Lopez* v. *United States*, 841 F.2d 16, 19 (1st Cir. 1988) ("the appellant himself admits that he was aware, before trial,

---

[50]It should be noted that, even in cases where the "newly discovered" evidence *was* actually in the plaintiffs' possession before trial — which was not the case here — a judge may nevertheless properly exercise her discretion to allow a motion for posttrial relief under rule 60 (b) (2). See *United States Steel* v. *M. DeMatteo Constr. Co.*, 315 F.3d 43, 52 (1st Cir. 2002); *Alpern* v. *UtiliCorp United, Inc.*, 84 F.3d 1525 (8th Cir. 1996).

of the policeman's identity and knowledge concerning the accident"); or making a strategic choice not to pursue the evidence, see *Knott* v. *Racicot*, 442 Mass. 314, 325 (2004), or failing to exercise "even minimal diligence." *Karak* v. *Bursaw Oil Corp.*, 288 F.3d 15, 19 (1st Cir. 2002) (moving party "fails to explain why this evidence could not have been found, well before the entry of judgment, in the exercise of even minimal diligence"). Here the plaintiffs' repeated efforts at increasingly tailored discovery were impeded at nearly every turn by Merrill Lynch.

It is unnecessary to decide whether Merrill Lynch deliberately withheld or destroyed the key documents that it did not produce. However, as the judge found, "it is at least fair to say that Merrill Lynch *should* have had these documents in its files, which would have led to their production"[51] (emphasis in original). The plaintiffs made pretrial document requests that squarely covered the documents. A party "treads on thin ice when he argues that [the plaintiffs] could have uncovered [the evidence] had [the] [p]laintiffs been more persistent in pursuing depositions and document discovery when several [court] orders . . . were necessary to compel discovery to move forward." *Kettenbach* v. *Demoulas*, 901 F. Supp. 486, 495 (D. Mass. 1995). It would reward obstruction of the orderly process of litigation effectively to penalize the plaintiffs for failing to discover what Merrill Lynch, for whatever reason, failed to produce in a timely manner, or failed to produce at all. The conduct of the nonmoving party is relevant to the question whether the moving party in a rule 60 (b) (2) motion exercised due diligence. See, e.g., *Alpern* v. *UtiliCorp United, Inc.*, 84 F.3d 1525, 1536 (8th Cir. 1996); *Kettenbach* v. *Demoulas*, *supra* (rule 60 [b] [2] motion

---

[51]The judge found that "one might well expect that Merrill Lynch itself would have a copy of the Patterson letter and its attachments. However, despite testimony from Levine that his brokerage group filed and retained all correspondence relating to their clients and that they retained all Benistar-related correspondence and documents, and despite pretrial document requests of the plaintiffs to Merrill Lynch that squarely covered this type of correspondence, Merrill Lynch never produced a copy of the Patterson correspondence from its files before, during, or after the jury trial." These facts alone do not conclusively prove that Merrill Lynch either intentionally destroyed or refused to produce documents in its possession, and the judge thus did not abuse her discretion in denying the plaintiffs' motion under Mass. R. Civ. P. 60 (b) (3), 365 Mass. 828 (1974).

allowed as to newly discovered tape recording containing an incriminating conversation with person who was apparently coconspirator with defendant where plaintiff's failure to depose coconspirator, whose identity was unknown before trial but might have been discovered, was due in part to defendant's own discovery abuses). We conclude that the judge, who was, as we noted earlier, intimately familiar with both the plaintiffs' attempts to obtain discovery and Merrill Lynch's resistance to that discovery, did not abuse her discretion in finding no lack of due diligence on the part of the plaintiffs.

d. *Newly discovered evidence: Paley.* The plaintiffs also offered as newly discovered evidence a separate affidavit from Paley. At trial, Paley invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions. See note 13, *supra.* In his posttrial affidavit, Paley averred that in October, 1998, he had at least one very specific conversation with Levine in which he explained Benistar Trust's business as an intermediary for § 1031 transactions, and explained that the funds in the Benistar Trust account at Merrill Lynch were third-party client funds. The judge found that the Paley evidence, if credible, would support the conclusion that Merrill Lynch had "actual knowledge" that the Benistar Trust account contained funds held in escrow for third-party clients, and provided "substantial assistance" to Benistar in misusing those funds. On the other hand, she also concluded that Paley's credibility was "extremely questionable" because his sworn statement was given in return for the plaintiffs' agreement to release Paley from damages "well in excess of $16 million." Because the Patterson evidence alone was sufficient to warrant allowing the plaintiffs' motion for posttrial relief under rule 60 (b) (2), we need not reach the question whether the Paley evidence alone would justify a new trial.[52] The plaintiffs are free to attempt to introduce the Paley evidence at the new trial.

The plaintiffs argue that, rather than granting a new trial, the court should allow their motion to reinstate the jury verdict. We

---

[52]We thus express no opinion here on the proper treatment under rule 60 (b) (2) of "newly discovered" evidence that was obtained in exchange for a release from civil liability for a witness who had invoked his Fifth Amendment privilege at trial.

are mindful of the burden on all parties that a new trial represents. But the judge was correct in concluding that the plaintiffs' preferred remedy would be inappropriate here. Even after the introduction of the newly discovered evidence, disputed issues of material fact remain; the credibility of the witnesses and documentary evidence must be weighed by the fact finder. As the plaintiffs would not be entitled to summary judgment, they are not entitled to reinstate the jury verdict.

5. *Remaining claims.* The judge denied the motion of Carpenter, Molly Carpenter, and Benistar Ltd. to dismiss the claims against them for lack of personal jurisdiction. The Benistar defendants argue on appeal that the judge lacked personal jurisdiction over any of the Benistar defendants with the exception of Benistar Trust. We have carefully considered their arguments in light of the evidence on the question. For essentially the reasons articulated by the judge and by the Appeals Court, we affirm. See *Cahaly* v. *Benistar Prop. Exch. Trust Co.*, 68 Mass. App. Ct. 668, 676-677 (2007). The Benistar defendants also appeal from the judge's denial of their motion for a new trial. Again, after careful consideration of the arguments, and for essentially the reasons articulated by the judge and by the Appeals Court, we affirm. See *id.* at 677-678. After careful consideration we likewise reject the remaining contentions of the Benistar defendants for essentially the reasons offered by the trial judge and the Appeals Court. See *id.* at 678-81.

6. *Conclusion.* For the reasons set forth above, we affirm the denial of the Benistar defendants' motion for a new trial and the entry of judgment against the Benistar defendants. We affirm the decision to grant judgment n.o.v. to Merrill Lynch. We affirm the decision granting the plaintiffs a new trial of their claims against Merrill Lynch. We remand the consolidated cases to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*